**Mari B. WILLIAMS, Plaintiff,**

v.

**CITY OF CHARLOTTE, N.C., Defendant.**

**No. 3:94–CV–179–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 29, 1995.

Louis L. Lesesne, Jr., Lesesne & Connette, Charlotte, NC, for plaintiff.

G. Michael Barnhill, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, for defendant.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment [Document #26], filed July 20, 1995. The Plaintiff filed a response to the motion on August 9, 1995, and the Defendant replied on August 25, 1995.

### SUMMARY

Williams has been employed by the Charlotte Police Department since 1981. She began as a police officer but was promoted to sergeant in 1991. (Williams Depo. at 6–8, 13.) After her promotion, Williams was assigned to work the third shift from 9:45 p.m. to 6:00 a.m. (*Id.* at 13.)

In the Fall of 1992 Williams informed her supervisor that she was having trouble sleeping[1] and asked for a shift change. (*Id.* at 28.) However, because the supervisor was unable to find a sergeant that would voluntarily swap shifts, Williams remained on the night shift. (*Id.* at 32.)

In January of 1993 the Department placed Williams into a daytime sergeant position in the "Secondary Employment Office" to help her with her sleeping problems. (*Id.* at 32–34.) However, this position was slated for elimination prior to Williams taking it. (Bo-

ger Depo. at 9–10, 24.) When it was eliminated in July of 1993 Williams was reassigned to the night shift. (Williams Depo. at 35.)

On August 17, 1993 Williams consulted with Dr. Dennis Hill about her difficulty sleeping. (*Id.* at 37; Hill Depo. at 28.) Dr. Hill diagnosed Williams as having shift work sleep disorder and prescribed a course of treatment. (Hill Depo. at 35–58.) This course of treatment was, for whatever reason, unsuccessful.

On August 31, 1993 Williams revisited Dr. Hill. (Williams Depo. at 67, 88.) Dr. Hill recommended that she stay out of work for a week and wrote a letter recommending that Williams not be required to work the night shift. (*Id.* ex. 2.) Williams gave this letter to her supervisor and stayed home the following week. (*Id.* at 91.)

On September 9, 1995 Williams wrote a letter stating that she was a qualified individual with a disability under the ADA, that her disability substantially interfered with her ability to work the night shift, and that she should be accommodated by being reassigned to a non-night shift sergeant position. (*Id.* ex. 5.) The Department refused to reassign Williams, but said that it would allow a voluntary swap. (*Id.* at 94.) Williams found no volunteer.

Because Williams informed the Department that she was unable to perform her duties on the night shift, the department placed her on daytime administrative duty at her same pay and benefits. (*Id.* at 95–98.) Williams is currently working as a supervisor in the Expeditor's office—a regular assignment for a sergeant—for at least as long as this action is pending. (Williams Aff. 2.) Moreover, the Defendant has offered to place Williams in a city or non-sworn department job which is suited to her needs and abilities. (Williams Depo. ex. 13.) Williams responded that this offer to accommodate was unacceptable. (*Id.* ex. 14.)

Williams is now suing under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et*

---

1. Williams explained to her supervisor that her sleep problems were jointly caused by her work schedule and off-duty family commitments as a single mother, such as "going home, taking the kids to school." (Williams Depo. at 14–19, 28.)

seq., (ADA), claiming that she is a qualified person with a disability, and that the City discriminated against her by failing to provide a reasonable accommodation. The City requests summary judgment.

### SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides,

> ... judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Summary judgment must be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Id., Barwick v. Celotex Corp., 736 F.2d 946, 958 (4th Cir.1984). To attain summary judgment, the movant bears an initial burden of demonstrating no genuine issues of material fact are present. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party who must point out specific facts which create disputed factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, ——, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, district courts must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

■ An issue of material fact is genuine when, "the evidence ... create[s] [a] fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds could recognize as real factual disputes." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence from the entire record could not lead a rational fact finder to rule for the non-moving party. Matsushita Electric Industrial Co., 475 U.S. at 587, 106 S.Ct. at 1356; Celotex Corp., 477 U.S. at 322–23, 106 S.Ct. at 2552–53, 91 L.Ed.2d 265 (1986).

### ANALYSIS

The ADA proscribes employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to ... [the] terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). The Defendant argues that Williams has no "disability" under the Act, and therefore the ADA claim fails. The Court agrees.

■ A "disability" is defined by the Act as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual...." 42 U.S.C. § 12102(2)(A). "The statutory language, requiring a substantial limitation of a major life activity, emphasizes that the impairment be a significant one." Forrisi v. Bowen, 794 F.2d 931, 933–934 (4th Cir.1986) (emphasis in original).[2]

> The Act ... assures that truly disabled, but genuinely capable individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps. It would debase this high purpose if statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of im-

2. Forrisi was brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. Nevertheless, the language of the Rehabilitation Act and the ADA is substantially similar and the same

analysis applies. Doe v. University of Maryland Medical System, 50 F.3d 1261, n. 9 (4th Cir. 1995).

pairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

*Id.* The "Physical condition must place the 'individual so far outside the norm as to make it impossible or unusually difficult . . . to perform work that could usually be done by most other people.'" *Welsh v. City of Tulsa, Oklahoma,* 977 F.2d 1415, 1418 (10th Cir.1992) (omission in original; quoting, *Cook v. State of R.I., Dep't of Mental Health, Retardation & Hosps.,* 783 F.Supp. 1569, 1574 (D.R.I.1992)).

 In the case at bar, the City has offered evidence—including a statement of Williams' own doctor—showing that "difficulty sleeping during the day or being alert on the job at night" is normal for night shift workers (Hill Report at 1), and that the "overwhelming majority" of night shift workers experience shift work sleep disorder (Hill Depo. at 21). Williams does not contest—but in fact concedes—the prevalence of "shift work sleep disorder." (Plaintiff's response at 6.) Thus, Williams' alleged disability is nothing more than a commonplace condition which does not precipitate any particular disadvantage. As such, it is not an "impairment" which qualifies as a "disability" under the Act. Moreover, a physical condition does not automatically qualify as a "disability" simply because it is documented by a medical study, diagnosed by a doctor, or capable of being medically treated. Rather, it must be a "disability" for the individual plaintiff as defined by the Act. Accordingly, the Court finds that Williams' allegations of shift work sleep disorder—even if proved—fail to qualify her as a person with a disability under the ADA. Accordingly, summary judgment will be granted.

 Moreover, Williams' alleged shift work sleep disorder does not "substantially limit[ ] one or more of [her] major life activities" under 42 U.S.C. § 12102(2)(A). Williams claims that the "disorder" substan-

tially interferes with her ability to "work." (Complaint at ¶ 6.) Although working is unquestionably a major life activity, there is no substantial interference in this case.[3]

"While the regulations define a major life activity to include working, this does not necessarily mean working at the job of one's choice." *Welsh,* 977 F.2d at 1417 (citing, *Tudyman v. United Airlines,* 608 F.Supp. 739, 745 (D.Cal.1984). "[T]he proper inquiry [is] 'whether the particular impairment constitutes for the particular person a significant barrier to employment.'" *Hughes v. Bedsole,* 48 F.3d 1376 (4th Cir.1995) (quoting, *Forrisi,* 794 F.2d at 933). "Relevant to the inquiry are the 'number and type of jobs from which the impaired individual is disqualified, the geographical area to which the individual has reasonable access, and the individual's job expectations and training.'" *Forrisi,* 794 F.2d at 933 (quoting, *Jasany v. Unite States Postal Service,* 755 F.2d 1244, 1249 (6th Cir.1985)).

In the case at bar, the City has submitted evidence tending to show that Williams is qualified for numerous non-night shift jobs based on her prior experience in sales, shipping and receiving, and law enforcement: 63,123 jobs in North Carolina and 3689 jobs in Charlotte in a one-year period. (Defendant's Ex. 17, (King Aff.).) Williams has submitted a 1991 statistical abstract showing that 12.8% of jobs in the United States involved night, rotating, irregular, or "other" schedules, thereby disqualifying Williams. (Plaintiff's Ex. 1.) This percentage was higher (50.2%) for "protective service workers." (Plaintiff's Ex. 2.)

Although being precluded from 12.8% of jobs generally and half of the jobs in "protective services" would certainly be a "barrier" to employment, the Court finds that it is not a "significant barrier" for this Plaintiff. It is undisputed that Williams has reasonable access to thousands of jobs in this geographical area for which she is qualified and which do not require night work. The available-jobs number, however, is only a hypothetical pro-

---

**3.** The Court declines to address whether Williams' "impairment" substantially interferes

with a major life activity other than working.

jection based on statistics. The undisputed historical facts of this case compel a finding that Williams had no actual barrier to employment whatsoever. Williams was offered—yet rejected—other positions with the Police Department or with the City. (Defendant's Exhibits 13 and 14.)

Therefore, given the absence of any real restriction on Williams' ability to find satisfactory employment—especially when coupled with the undisputed fact that her "impairment" is the expected physical response to night shift work by the "overwhelming majority" of workers—Williams clearly does not have a "disability." Again, summary judgment must be granted.

■ Finally, even assuming *arguendo* that Williams is a qualified individual with a disability, the City has not discriminated against her.

Williams claims that the City discriminated against her by "refus[ing] to accommodate [her] disability ..."[4] (Complaint at ¶ 8.) As noted above, Williams is not disabled and no duty to accommodate is imposed by the statute. Nevertheless, the City has in fact offered a reasonable accommodation to the Plaintiff. That is, the City believed that Williams' professed inability to work the night shift—although not the result of a "disability"—precluded her from performing an essential job function of a police sergeant.[5] (Defendant's Exhibit 13.) Accordingly, the City offered to accommodate Williams by giving her a "non-sworn" day job with the department or elsewhere with the City. *Id.* Although this accommodation is perfectly reasonable (*see, e.g., Severino v. North Fort*

*Myers Fire Control Dist.,* 935 F.2d 1179, 1183 (11th Cir.1991) (Fireman with AIDS assigned to " 'light duty' " held a reasonable accommodation, despite fireman's complaints that such work was " 'demeaning.' ") Williams refused it. (Defendant's Exhibit 13.)

■ Certainly Williams would prefer the accommodation of being assigned to a day shift as a sergeant. Nevertheless, the City has satisfied any statutory obligation to reasonably accommodate Williams by offering her a different position. The ADA simply does not mandate that an employer accept whatever reasonable accommodation a disabled employee may desire, so long as the employee is offered a reasonable accommodation. *Cf. Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986).[6]

In sum, the undisputed evidence shows that Williams neither had a "disability" nor was she discriminated against by the City on account of any real or perceived "disability." Therefore, the Plaintiff's claim fails and summary judgment must be granted.

**NOW, THEREFORE, IT IS ORDERED** that Defendant's motion for summary judgment [Document # 26] be, and hereby is, **GRANTED.** This action will be dismissed in a separate Judgment filed simultaneously with this case.

4. "Discrimination" is defined to include "not making a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business ..." 42 U.S.C. § 12112.

5. The Court expresses no opinion as to whether ability to work the night shift is in fact an essential job function of a police sergeant.

6. The *Philbrook* case concerned the reasonable accommodation of the plaintiff's religious beliefs under Title VII. Because the reasonable accommodation language of the ADA is substantially

similar to that of Title VII, the same reasoning applies: compare Title VII, 42 U.S.C. § 2000e(j) (the employer violates the statute unless it "demonstrates that [it] is unable to reasonably accommodate ... an employee's religious observance or practice without undue hardship on the conduct of the employer's business.") with the ADA, 42 § 12112(b)(5)(A) (the employer violates the statute by "not making a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business ...").