**John R. TURCO, Plaintiff,**

v.

**HOECHST CELANESE CHEMICAL GROUP, INC., Defendant.**

**Civ. A. No. G–95–007.**

United States District Court,
S.D. Texas,
Galveston Division.

Dec. 5, 1995.

Michael E. St. John, Stevenson & St. John, Houston, TX, for plaintiff.

Richard R. Brann & Paul L. Mitchell, Baker & Botts, Houston, TX, for defendant.

## OPINION AND ORDER

HUGH GIBSON, District Judge.

Before the Court is Defendants' Motion for Summary Judgment, filed on September 21, 1995, requesting the Court to grant judgment as a matter of law against Plaintiff upon his Americans with Disabilities Act claim.[1] Not only has plaintiff duly responded to this motion, but the parties have also filed

---

1. Pursuant to a Rule 41(a) Stipulation of Dismissal and subsequent order entered October 3, 1995, defendant Hoechst Celanese Corporation was dismissed with prejudice from this action. The Court thus refers to the pending motion as the remaining "defendant's" motion.

replies, ripostes, rebuttals, and supplements in support of their respective positions. Having carefully considered the issues so exhaustively briefed by both parties, the Court finds that defendant's motion should be granted.

## I. Background

The record contains several salient, undisputed facts. Plaintiff John Turco ("Turco") worked as a chemical process operator for Defendant Hoechst Celanese Chemical Group, Inc. ("Hoechst") at its Clear Lake plant for thirteen years. Turco worked a rotating shift, and routinely was required to work through the night. In the mid-1980s Turco was diagnosed with diabetes mellitus and began taking oral medication to keep his condition regulated. Apparently, this treatment succeeded for several years. In January, 1994, however, progressive exacerbation of Turco's diabetes culminated in his being prescribed insulin to regulate his blood sugar. Turco's co-workers and supervisors as well as Hoechst's human resource personnel were well aware, nearly from the onset, that Turco was a diabetic; they were also aware of his becoming an insulin-dependent diabetic.

Though testimonial evidence in the record indicates that Turco's supervisors considered him a capable operator overall, Turco's year-end performance appraisals in 1992 and 1993 emphasized that he needed to improve his attitude, cooperation, poor attendance record, and commitment to safety. Though the parties dispute the cause, Turco's performance by his own admission began to deteriorate in 1994. He occasionally became confused and lost concentration, at one point "forgetting what to do next" while working in the plant's control room. Turco's confusion apparently impeded his ability to remember and follow standard operating procedures. For example, on February 11, 1994, Turco was acting as a "step-up" or stand-in supervisor when the plant received an odor complaint. In violation of the apparently recently revised procedure, Turco failed to notify a Utilities Representative, instead opting to drive to the area in question to assess the odor himself. Turco was informally verbally "counseled" or reprimanded about the incident, but was never formally disciplined.

Given his admitted, increasing difficulties on the job, Turco responded on March 11, 1994 to an internal job posting for the available position of process analyzer technician. The testimony is undisputed that the analyzer technician's job is less physically demanding than that of a process operator. Though the job entails no routine night-shift work, it does require the technician to respond to 24-hour emergency call and to work some overtime. Turco was not chosen to fill the analyzer technician position. By letter dated March 21, 1994, Turco's treating physician, Dr. James Eden, recommended that Turco be transferred to a daylight position, concluding that the more predictable eating, sleeping, and exercise patterns accompanying an exclusively daytime schedule would facilitate the regulation of his blood sugar levels. In response to this letter, Hoechst's company nurse met with Turco shortly thereafter and requested him to make an appointment with a company-selected endocrinologist so that his diabetic condition could be independently evaluated. Whether the responsibility lay with Turco or with the nurse to arrange this appointment is subject to considerable controversy in the record. This factual dispute notwithstanding, Turco clearly never met with this endocrinologist.

In the meantime, Turco was formally subjected to disciplinary action for two further violations of Hoechst's safety protocol. Though evidence of other of Turco's procedural lapses appear in the record, it is to these two "primary incidents" of policy transgression which Hoechst attributes Turco's eventual termination. The first occurred during Turco's night shift on March 24, 1994. Noticing that the water level in the liquid incinerator was low, Turco connected the plant's fire water supply to the incinerator's high pressure valve. Resolving the fact disputes surrounding the incident in Turco's favor, the Court finds that Turco recorded his actions in the shift book and apparently relayed the information to his relief operator when he ended his shift at 6:00 a.m. that morning. He then went home. Several hours later, workers testing the fire water

nozzles at the "tank farm" detected acrylic acid and other chemicals in the water. Many of the hazardous organic materials which contaminated the water during the hook-up to the incinerator were highly flammable. As fire water is used, as the name suggests, to extinguish fires in the plant, the perils of contamination are obvious. When asked during deposition whether he recognized the danger of making such a hookup, Turco himself admitted that "[he] knew it was dangerous, extremely dangerous." Were one to douse a fire with contaminated water, Turco conceded, one would "have a mess." Plant workers spent nearly twelve hours flushing the water of all hazardous materials. The evidence is clear that Hoechst considered terminating Turco for this violation, but that Turco's immediate supervisor, Don Hardt, spoke in his behalf and convinced management to give him another chance. On May 2, 1994, Turco was subjected to written corrective action for his acts.

The second primary incident to which defendant attributes Turco's termination occurred on May 13, 1994. While cleaning a strainer on a crude acrylic acid truck and rail circulation filter, Turco exposed his arms to acrylic acid polymer. The record reveals that during the cleaning process Turco had rolled up the sleeves on his protective splash suit and had rolled down his rubber gloves, in violation of safety regulations, and that he may have failed to wash the exposed area for the full recommended time of fifteen minutes. His most serious procedural violation, however, apparently consisted in his failure to promptly report the incident to his supervisor. Instead, Turco went home after his shift and went to bed, awaking during the early morning in response to the discomfort and swelling in his forearms. He reported the injury upon his arrival at work the next morning, and a physician subsequently treated him for first-degree chemical burns. On June 3, 1994, citing Turco's "repeated behaviors of not following procedures" and his "failure to demonstrate a sustained willing-

ness to change this behavior," Hoechst terminated Turco's employment.

## II. Issues

John Turco brings his claim under the Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C. § 12101 *et seq.* He claims that, contrary to defendant's assertion that he was fired for repeatedly failing to follow standard operating and safety procedures, Hoechst fired him because he is disabled, that is, because he is a diabetic, and because his diabetes frequently forced him to miss work. He claims also that defendant violated the terms of the ADA in that it failed to reasonably accommodate him by declining to transfer him to a position as analyzer technician or another daytime-shift position.[2] Defendant Hoechst Celanese contends that plaintiff's extensive history of absenteeism and his pattern of procedural neglect, which on several occasions gravely endangered the health and safety of other workers at the plant, provided Hoechst with ample legitimate, nondiscriminatory business reasons to end Turco's tenure with the company.

## III. Analysis

A party seeking summary judgment must produce evidence which tends to show that no genuine issue of material fact exists in the case and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once the movant has made such a showing, the burden shifts to the non-moving party to show that such a fact issue does remain. *See Duckett v. City of Cedar Park,* 950 F.2d 272, 276 (5th Cir. 1992). "This showing requires more than 'some metaphysical doubt as to the material facts.'" *Johnston v. City of Houston,* 14 F.3d 1056, 1060 (5th Cir.1994) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584–86, 106 S.Ct. 1348, 1354–56, 89 L.Ed.2d 538 (1986)). A court must "review the facts drawing all inferences most favorable to the party opposing the

2. The Court notes that plaintiff claims that defendant began to discriminate against him—by disciplining him for mistakes for which other workers were not disciplined—only after he requested a transfer. While this appears to resemble a

claim that plaintiff was retaliated against for engaging in an ADA-protected activity, plaintiff does not raise a retaliation claim here. Nor, as defendants point out, did he raise such a claim within the body of his EEOC claim.

motion." *Rosado v. Deters,* 5 F.3d 119, 123 (5th Cir.1993) (internal quotation marks omitted) (quoting *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986)). In this case, Hoechst claims that no genuine issue of material fact exists with respect to any element of Turco's ADA claim and that, therefore, summary judgment should be entered in its favor.

▮ In order to prevail upon his claim under the Act, Turco ·must prove that:

(1) he is disabled; that is, he suffers a mental or physical impairment that substantially limits at least one major life activity [3];

(2) he is a "qualified" individual with a disability; that is, he is one who "with or without reasonable accommodation, can perform the essential functions of the employment position....";

(3) he was discharged or subjected to some other adverse action with regard to terms, conditions, or privileges of employment; and,

(4) it was more likely than not that his disability was a determining factor in Hoechst's decision to discharge him or to otherwise subject him to an adverse employment action.

*See* 42 U.S.C. §§ 12112(a), 12102(2), 12111(8). *Cf. Chandler v. City of Dallas,* 2 F.3d 1385, 1390 (5th Cir.1993) (Rehabilitation Act case), *cert. denied,* — U.S. —, 114 S.Ct. 1386, ·128 L.Ed.2d 61 (1994). Thus, if Turco's diabetes impaired his ability to perform the essential functions of his job, he must demonstrate that with reasonable accommodations, i.e., accommodations which would not have placed undue hardship on Hoechst, he would have been able to bring his job performance up to acceptable standards. *See* 42 U.S.C.A. § 12111(10).

▮ As both parties recognize, courts have applied the framework of shifting evidentiary burdens applicable in Title VII employment discrimination cases to cases involving discrimination under the ADA. *See, e.g., Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108 (8th Cir.1995); *Aikens v. Banana Republic,*

*Inc.,* 877 F.Supp. 1031 (S.D.Tex.1995). *See generally McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–05, 93 S.Ct. 1817, 1823–26, 36 L.Ed.2d 668 (1973) (Title VII race discrimination case); *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (Title VII race discrimination case). Thus, once the plaintiff has established a presumption of discrimination by meeting his prima facie burden, the defendant can rebut the presumption by articulating legitimate, nondiscriminatory reasons for the discharge. *See St. Mary's,* at —, 113 S.Ct. at 2747; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (Title VII gender discrimination case). Defendant's burden, however, is merely one of production; the burden of proving that defendant's articulated reasons are pretextual *and* that discrimination was the real reason for the discharge remains at all times with the plaintiff. *See St. Mary's,* — U.S. at —, 113 S.Ct. at 2747; *see also Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 957 (5th Cir.1993) (Age Discrimination in Employment Act (ADEA) case).

▮ While Hoechst, perhaps predictably, contests plaintiff's ability to raise a viable fact question with regard to every one of the prongs of his prima facie case, the Court notes that the major portions of both parties' briefs are devoted to discerning whether Hoechst's purported legitimate reasons for discharging Turco were its actual reasons or whether they served as a mere pretext for its discriminatory motives. In fact, defendant asserts that the ultimate failure of the plaintiff to prove disability discrimination "renders moot the issues of whether plaintiff is a qualified individual with a disability under the ADA." On the other hand, as plaintiff observes, once an employment discrimination case devolves into "nebulous questions of motivation and intent," summary judgment upon the claims is rarely appropriate. *See Thornbrough v. Columbus & Greenville R. Co.,* 760 F.2d 633, 640 (5th Cir.1985) (ADEA case). Indeed, the Court finds that summary judgment should be granted not upon the issue of legitimate rea-

---

**3.** 42 U.S.C. § 12102(2).

sons or pretext, as resolving such issues invariably involves assessments of evidentiary credibility and weight, but rather upon the ground that Turco has produced a mere scintilla of evidence to show that he is qualified for his position, either with or without reasonable accommodation. *See Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512 (noting that a mere scintilla of evidence will not suffice to defeat a summary judgment motion).

 While defendant disputes that plaintiff's condition substantially limits even one of his major life activities, the Court finds that, at the very least, plaintiff has raised a sufficiently genuine fact issue with respect to this point. *See* 42 U.S.C. § 12102(2); *see also* 29 C.F.R. §§ 1630.2(j), 1630.2(i).[4] Regulations which implement the ADA define a physical impairment as

[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine. . . .

29 C.F.R. § 1630.2(h)(1). *See also Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 726 (5th Cir.1995).[5] "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[6] 29 C.F.R. § 1630.2(i). *See also Dutcher,* 53 F.3d at 726 n. 7 (noting that the EEOC's Interpretive Guidance lists other

possible major life activities such as lifting, reaching, sitting, or standing). While working is itself listed among the major life activities, " 'working' does not mean working at a particular job of [one's] choice." *Wooten v. Farmland Foods,* 58 F.3d 382, 385–86 (8th Cir.1995). *See also Dutcher,* 53 F.3d at 727. Moreover, in evaluating whether a plaintiff is disabled, courts should first consider whether the plaintiff's impairment substantially limits major life activities other than working. *Dutcher,* 53 F.3d at 726 n. 10.

Dr. James Eden, who treated Turco from 1983 to 1988 and again beginning in January, 1994, testified that the form of diabetes mellitus with which Turco is afflicted, the type caused by pancreatitis, differs from typical Type II adult-onset diabetes in that it progresses to insulin dependence at an earlier age. Moreover, the doctor testified that in patients with this type of diabetes "there's probably a little more difficulty in controlling any blood sugar because the elevated triglycerides interfere with interpretation of blood sugar testing." Eden described the problems which insulin-dependent diabetics face when their blood sugar either surges above or dips below the norm:

If the diabetes [sic] goes too high, [the diabetic] can have further damage to the microvascular system in his body which would cause damage to arteries in the brain, the kidney, the heart, and also damage in that fashion to the nerves in his body. He can have ulcerations from the diabetes. He can have occlusions of the

---

4. In its "Interpretive Guidance on Title I of the Americans with Disabilities Act," which is appended to part 1630 of title 29 of the Code of Federal Regulations, the Equal Employment Opportunity Commission ("EEOC") concludes that any insulin-dependent diabetic has a disability *per se* under the ADA, reasoning that "a diabetic who without insulin would lapse into a coma would be substantially limited ... without the aid of medication." 29 C.F.R. Part 1630, App.. However, the Fifth Circuit has not expressly adopted this *per se* standard and has declined to decide whether a similar standard should apply to cases arising under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq. See Chandler v. City of Dallas,* 2 F.3d 1385, 1391 (5th Cir.1993). *See also Coghlan v. H.J. Heinz Co.,* 851 F.Supp. 808, 813 (N.D.Tex.1994) (rejecting the EEOC guide's "interpretive gloss" as "at odds with

clear statutory language," finding the *per se* approach to "[read] 'limits' right out of the [ADA]"). Moreover, the Fifth Circuit has observed that "[t]he prospect of continuing medical advances in the treatment of diabetes (at an inherently unpredictable rate), further supports the need for individualized inquiries in this area." *Chandler,* 2 F.3d at 1396.

5. *Cf. Chandler, supra,* 2 F.3d at 1390 (quoting the Department of Health and Human Services (DHHS) regulations' definition of "handicap" under the Rehabilitation Act, 45 C.F.R. § 84.3(j)(2)(i) (1992), a term "substantively equivalent" to the term "disability" under the ADA).

6. *Cf. Chandler,* 2 F.3d at 1390 (quoting DHHS regulations at 45 C.F.R. § 84.3(j)(2)(ii) (1992)).

arteries, the larger arteries of the legs and of the brain ... causing sometimes gangrene and sometimes stroke.... If his blood sugar were low, the patient can feel weak, shaky, faint. If the blood sugar goes too low, the patient can lose consciousness, have brain damage from severely low blood sugar, convulsions, and death. He can also have convulsions and death if the blood sugar goes very high, too.

In January, 1994, Turco reported to Dr. Eden that he had been having "severe pain in both legs" for about three months. As Turco had not responded to pain medications, Eden surmised that Turco's pain was myofascial—relating to muscles and connective tissue of the body—and caused by peripheral neuropathy, which in turn is "probably caused by [a diabetes-induced] degenerative change in the blood vessels supplying the nerve." Suspecting that Turco's diabetes was getting more severe, Dr. Eden referred Turco to an endocrinologist, Dr. Kaul. Eden testified, upon reviewing Dr. Kaul's records that Turco reported to Dr. Kaul on January 7, 1994, complaining of "severe hyperesthesia, backaches ... paresthesias in both legs and thighs ... [as well as] some abdominal discomfort," and was admitted to the hospital for testing. These medical records reflect that although Turco had been prescribed maximum levels of Micronase, an oral medication which lowers blood sugar, his diabetes was uncontrolled, accompanied by high blood sugar levels, polyuria (frequent urination), polydipsia (continual thirst despite frequent fluid intake), and dryness of mouth. Dr. Kaul essentially confirmed Dr. Eden's suspicions, diagnosing "diabetes with multiple complications including severe [bilateral] diabetic sensory motor neuropathy and hyperlipemia [elevated triglycerides]." Kaul also found Turco's blood sugars to be in the range between 250 and 300, a "moderate to severe" elevation, the norm being between 100 and 160 "but never above 200."

On January 20, 1994, Turco saw Dr. Eden again, reporting blood in his urine, and was subsequently treated for a kidney stone, apparently unrelated to his diabetes. On March 21, 1994, Dr. Eden again examined

Turco, this time because he had had a hypoglycemic, or low blood sugar, episode the previous Friday. Turco also reported having trouble sleeping, which he attributed to his rotating work shift. At that time, Dr. Eden diagnosed Turco with "severe brittle diabetes," and agreed with Turco that a daytime schedule would aid him to regulate his blood sugar. In the course of his deposition, Eden testified that " 'brittle' means that the diabetes is more difficult to control. It's more sensitive to skipping meals or activity such as work, or it's more sensitive to diet.... Sometimes it seems to go up and down for no reason at all...." Eden opined that by March, Turco was having "extreme problems" controlling his blood sugar, resulting in "weakness and some sweating and confusion...." Yet again on April 21, 1994, Turco went to Dr. Eden with elevated blood sugar and reported that he had been feeling weak and dizzy. In mid-April, Eden began prescribing Tylenol–3 with codeine to Mr. Turco in order to control his leg pain which continued despite the fact that his diabetes was "somewhat" controlled. Turco himself offers as an exhibit a copy of an interoffice memorandum which he sent to his supervisor Don Hardt on Thursday, May 5, 1994, reporting that his "sugar [had] been high since [their] meeting on Tuesday," and urgently requesting a meeting to discuss his chances of getting a day shift job. Since his termination in June, 1994, Turco has apparently secured daytime employment. According to Dr. Eden, Turco is satisfactorily managing his diabetes now, something which he attributes at least in part to Turco's regular daytime schedule.

Turco himself testified that, while working for Hoechst, he frequently had to go home during his shift because his blood sugar was too low. Before he finally requested a job transfer, Turco claims, he repeatedly told his shift supervisor, Don Hardt, that he was "having a hard time concentrating and having a hard time doing [his] job because of [his] diabetes." He also had "a hard time remembering stuff," such as meetings or appointments, and recalled "walking to the incinerator with [his] legs hurting so bad that [he] could hardly walk." Moreover, he testified, "I couldn't climb. The concentration

was really bad. My sugar would get low and I would even forget my own name." He admitted that his shift schedule was not the only factor which impeded his ability to perform the functions required of a process operator. Rather, his neuropathy and resultant inability to walk or climb, as well as his inability to concentrate properly rendered it impracticable for him to continue on in his position. Turco testified that he "would have taken any job," even one which paid less, had defendant offered it to him.

The record thus primarily contains evidence of the manner in which Turco's diabetes affected the major life activity of working. Though Turco does not assert that he cannot "feed [him]self, drive a car, attend [his] grooming, carry groceries, wash dishes, vacuum, and pick up trash," his acute leg pain and poor concentration did have "spill over" effects into the remainder of his life. *But cf. Dutcher, supra,* 53 F.3d 723 at 726 (finding that plaintiff, who suffered a permanent injury to her arm, could perform the "normal activities of daily living" listed above). As his deposition reveals, for example, the neuropathy in his legs has rendered him unable to walk, to ride a bike, or to do any other type of physical exercise since he began experiencing leg pain. He testified also that since 1993 the diabetes has interfered with his ability to have or enjoy sexual intercourse. Thus, while the evidence shows that Turco's major life activity of working may be limited only with respect to a relatively narrow range of jobs in chemical process operation, albeit that range for which he has the most training and experience, the Court finds sufficient evidence in the record to indicate that some of Turco's other major life activities may be substantially limited. Accordingly, the Court presumes for purposes of evaluating defendant's summary judgment motion that Turco could produce enough evidence for a reasonable jury to find that he is "disabled" within the meaning of the ADA.

This brings the Court to the question of whether Turco has presented enough evidence for a jury to find that he has proved the second element of his prima facie case, namely, that he is "qualified" for his position, either with or without reasonable accommodation. The Court finds that he has not. As the Court has noted, the ADA defines a qualified individual with a disability to be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The statutory reference to "individuals" who "desire" positions refers not only to job applicants but also to individuals "who are already employed and then become disabled...." *Daugherty v. City of El Paso,* 56 F.3d 695, 699 (5th Cir.1995). "The term 'reasonable accommodation' may include ... 'reassignment to a vacant position.'" [7] 42 U.S.C. § 12111(9). However, qualification standards which tend to screen out disabled individuals but which are "consistent with business necessity" can provide a defense to a discrimination charge under the ADA. *Id.* at 12113(a). Standards which disqualify individuals who pose "a direct threat to the health or safety of other individuals in the workplace" also pass muster under the Act. 42 U.S.C. §§ 12113(b), 12111(3). In order to prevail upon his claim that Hoechst discriminated against him in denying him such an accommodation, Turco must show that he was treated differently from other similarly situated employees with regard to either the denial of transfer or denial of shift change. *Daugherty,* 56 F.3d at 700.

Defendant claims that it embarked upon a course of evaluating possible accommodations for Turco but argues that Turco failed to cooperate, in that he failed to arrange an appointment with the endocrinologist, Dr. Poffenbarger.[8] In her affidavit,

---

7. The statute defines "discrimination" to include "not making a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112.

8. The EEOC interpretive regulations recommend that the employer initiate such "an informal, interactive process" to determine the extent of the employee's limitations. 29 C.F.R.

the supervisor of the Clear Lake plant's human resources department, Margaret Batcheler, stated that had the endocrinologist "concluded that plaintiff could not work shift work, the Clear Lake plant would have taken all reasonable steps to assist plaintiff in transferring to a straight day shift position for which he was qualified." While Hoechst's policy of attempting to reassign disabled employees in every circumstance is commendable, and undoubtedly fosters employee satisfaction and loyalty, it is not federally mandated. *See White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995). Hoechst's efforts notwithstanding, the Court finds that the company was under no legal obligation to accommodate Turco by creating a daytime operator position for him or by transferring him to the position of analyzer technician.

The Court has noted that employers are entitled to impose qualification standards upon their work force, even if those standards tend to screen out disabled individuals. " '[Q]ualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.... The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Daugherty*, 56 F.3d at 696 (internal citations and quotation marks omitted) (quoting 42 U.S.C. §§ 12113(a); 12111(3)).

■ The Court finds that Turco is—or was at the time of his discharge—not qualified for the position of chemical process operator, regardless of whether the shift is a rotating or daytime one. Turco has admitted that the neuropathy in his legs impairs his ability to climb, sometimes even to walk. This is the very reason why Turco requested a transfer to a less strenuous job and, in part, why his physician recommended that he switch to a daytime position. Turco concedes, though, that the job requirements that he walk, climb, and be able to concentrate would not diminish were he to perform the same job solely during daylight hours.

Though Dr. Eden notes that Turco's diabetes has been much better regulated since his departure from Hoechst, the Court observes that Turco is now a daytime sales clerk at a convenience store. The doctor's belief that Turco could have managed to regulate his blood sugar just as effectively had he continued to work as a process operator but switched to a straight day shift amounts to speculation. At one point in his deposition, the doctor reveals that exercise and physical exertion also affect blood sugar elevations. Clearly, a store clerk position is much less physically strenuous, or mentally demanding, than a position involving the processing of hazardous chemicals.

■ The law does not impose upon employers the burden of awaiting uncertain results of a disabled employee's treatment program. *See Fuller v. Frank*, 916 F.2d 558, 562 (9th Cir.1990) (holding that U.S. Postal Service was not required, after issuing "last chance" warning, to await outcome of alcoholic post carrier's treatment before terminating him); *Myers v. Hose*, 50 F.3d 278, 283–84 (4th Cir.1995). The ameliorative effect of a daytime shift upon Turco's hyper- and hypoglycemia—and his resultant neuropathy and inability to concentrate—is speculative, given the volatility and severity of his condition. While Dr. Eden felt that a straight daytime shift would be beneficial, he testified also that no dietary or lifestyle change could have prevented Turco's diabetes from exacerbating to the point where he needed to take insulin. As Dr. Eden notes, Turco has severe brittle diabetes; his blood sugar sometimes surges and plummets for no apparent reason. Clearly, these unpredictable blood sugar surges and dips, with their accompanying physical weakness and mental concentration lapses, could cause Turco to make mistakes and thus to endanger the safety of his coworkers in the chemical plant. *Cf. Chandler, supra*, 2 F.3d at 1395 (holding, as a matter of law, that an insulin-dependent city worker who is required to perform the "high risk activity" of driving "presents a genuine substantial risk that he could injure himself or others"); *accord Daugherty*, 56 F.3d at 698. "[I]f reasonable accommodation will not

§ 1630.2(*o* ). Such an interview is not required, however, by the provisions of the ADA. *See*

*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

eliminate a significant safety risk, a handicapped person is not otherwise qualified." *Chandler*, 2 F.3d at 1395. The evidence is uncontroverted that Turco cannot fill the position at Hoechst's Clear Lake Plant which he held for thirteen years, that of a chemical process operator, either with or without the accommodation of a shift change.

 Turco's claim that Hoechst failed to reasonably accommodate him does not rest exclusively, however, upon the claim that Hoechst denied him a daytime shift. He also asserts that his employer should have accommodated him by giving him another available position, specifically, the position of analyzer technician for which he applied on March 11, 1994. Again, defendant maintains that Turco's refusal to arrange an appointment with the endocrinologist Dr. Poffenbarger precluded it from granting him the transfer. The Court agrees that defendant was not obligated to transfer plaintiff to the analyzer technician job, though it does so for reasons other than Turco's ostensible lack of cooperation in meeting with the endocrinologist. As the Court has already noted, "[t]he term 'reasonable accommodation' may include . . . 'reassignment to a vacant position.'" 42 U.S.C. § 12111(9). *See also Daugherty*, 56 F.3d at 699. However, the ADA does not require employers to offer available positions to disabled employees who do not meet the job qualification standards. An employer is not required to make accommodations that would violate the rights of other employees. *Wooten, supra*, 58 F.3d at 386 (citing *Mason v. Frank*, 32 F.3d 315, 319 (8th Cir.1994)). Nor is an employer "required to endure undue hardship in accommodating the disability." *Daugherty*, 56 F.3d at 700 (citing 42 U.S.C. § 12112(b)(5)(A)). Where other employees are more qualified for an available position, or have more seniority, an employer is not required to offer the open position to an employee who requests a transfer because he or she is disabled. *See Dutcher*, 53 F.3d at 725 (employee's request for transfer to welding position which involved no climbing was denied at first because she had insufficient seniority; the transfer was subsequently granted only "because of her father's influence with the welding superintendent").

Turco must show that, with benefit of a reasonable accommodation, he was qualified for the vacant position. Even assuming that Turco's failure to follow proper procedures were traceable to concentration lapses occasioned by erratic blood sugar levels, which Turco has far from demonstrated, the record is uncontroverted that Turco's personnel file also contained criticism of his job performance with regard to aspects which could not have been affected by his diabetes, namely his attitude and willingness to cooperate. His performance appraiser for the 1992 performance period, Mitch Freeman, indicated that

> John['s] attitude and cooperation has [sic] not been good. . . . [He] needs to improve working with supervision like following company policies without hav[ing] to [be] told over and over again. . . . John needs to take the time to look up and review unit sop's [ (standard operating procedures) ], unit policies and plant procedures before acting. [He] sometime[s] takes short cuts in . . . the plant policies. . . . [He] has to be reminded to wear his goggles, hearing protection and glasses with side shields much to [sic] often, this is unacceptable and needs to be improved. . . . [John's attendance] is a [sic] improvement from last year but it is still unacceptable and must improve in 1993.

For the 1993 performance period, appraiser Bill Franklin noted improvement in some areas of Turco's performance but remarked that Turco "sometimes has to make a considerable effort to break old bad habits," and that he "needs to show commitment to safety. . . ." With respect to plaintiff's attendance, Franklin identified "a continuation of an ongoing problem that has existed for the past four years." In 1992, Turco missed 96 work hours; by the end of 1993 the annual total of missed work time had risen to 192 hours. Thus, the record demonstrates that Turco's file contained partially unfavorable performance appraisals well before January, 1994, the date by which his insulin-dependency was diagnosed and became known at the Clear Lake Plant. This evidence undermines Turco's assertion that his negative appraisals were retaliatory or discriminatory.

While plaintiff points out, in the course of his attack upon defendant's failure to transfer him, that his former supervisor, Leo Bull, testified that he was capable of handling the analyzer technician job, the Court observes that Bull's testimony also indicates that Turco would have needed additional job training to fill that position. That Turco's colleagues, after working with Turco for thirteen years, sought to help him retain his job at the plant is understandable, even laudable. Nevertheless, Hoechst was not legally obligated by such standards of loyalty or friendship to offer the position to Turco, and to retrain him, merely because he was disabled and no longer could perform his job as process operator. *Cf. Dutcher,* 53 F.3d at 728 (holding that a welder with a permanently injured arm, who was laid off during a reduction in force, was not discriminatorily denied reinstatement where the specific job which she had held previously—a non-climbing welding position—was unavailable at the time of rehiring). Yet even if Bull and other co-workers would have recommended Turco on the basis of his qualifications and experience alone, the Court questions whether Turco would have been able to manage the position's physical responsibilities and hazards. Plaintiff attaches as evidence a copy of the job announcement for process analyzer technician which was posted March 2, 1994 at the Plant. The posting indicates that analyzer technicians "are required to lift, climb, stand, stoop and work in awkward positions or tight places.... Hazards include working on live process and electrical systems and other hazards associated with chemical plant environment (shutdowns, leaks, fires, etc.)." Clearly, while the job of the technician may not be as strenuous as that of the operator, the job does entail physical tasks which Turco probably would find difficult given the bilateral neuropathy in his legs, and his resultant, occasional inability to walk. Moreover, the technician position carries with it the inherent risks of working in the chemical industry: Any forgetfulness or confusion on Turco's part with regard to standard operating procedures is as potentially dangerous in this position as in the operator position.

Not only has Turco failed to demonstrate that he could have satisfied these essential job requirements, he also has failed to show that exception should have been made to the internal personnel policies which impeded his transfer. The record shows that Turco applied for the transfer on March 11, 1994; his safety violation involving the fire water occurred on March 24, 1994. At the time he applied for the transfer, Turco had received several negative performance and attendance appraisals regarding his work in the operator position. Once he was placed on written corrective action on May 2, 1994, in response to the fire-water incident, he was effectively precluded from being considered for a new position under company policy. The Hoechst Celanese Human Resources Administrative Procedure governing Corrective Action, effective October 1991, provides at paragraph 3.6 that "[a]ny employee that has a corrective action letter in their [sic] personnel file will not normally be considered for transfer/promotion at their [sic] request...." When Turco again approached supervisor Don Hardt on May 5, 1994 about a transfer to a daytime position, Hardt testified, Hardt "made John aware of [this] policy ... and told him that the only thing that [he] could tell him to do was to talk to HR and see if they would consider deviating from the policy based on his [diabetic] condition[ ]." The record shows that Hardt later did speak to Human Resources supervisor Margaret Batcheler, who indeed seemed to make an exception for Turco. Batcheler assured Hardt that Turco could submit his name for an open daylight position, despite his performance record, and that such a transfer would be given more serious consideration once Turco had been evaluated by an endocrinologist.

The Court merely cites plaintiff's failure to satisfy defendant's transfer standard as evidence of plaintiff's inability to demonstrate that he is qualified for or can perform the essential functions of the technician job. While plaintiff argues that the transfer which he requested is a reasonable accommodation under the ADA, the Court notes that two cases which plaintiff cites upon this point, *Buckingham v. U.S.,* 998 F.2d 735 (9th Cir.1993), and *Tuck v. HCA Health Services of Tennessee, Inc.,* 7 F.3d 465 (6th Cir.1993), both Rehabilitation Act

cases, are distinguishable from the case at bar. In *Buckingham*, a postal service worker with AIDS requested a transfer to a different location where better medical care was available. The Postal Service claimed that its collective bargaining agreement with the postal workers' union, which provided that only those workers with at least one year of seniority would be considered for geographical transfer, precluded it from transferring plaintiff as he had been employed for less than a year. Rejecting the Postal Service's argument that it was precluded from contravening the seniority rights of other employees, the Ninth Circuit held that "the Postal Service's duty to comply with federal anti-discrimination law is a [sufficient circumstance] to warrant the minimal displacement of its transfer preference scheme." *Buckingham*, 998 F.2d at 741. However, the Court of Appeals noted that "[i]n order to succeed [the plaintiff] must show that the suggested accommodation would, more probably than not, have resulted in his ability to perform the essential functions of his job." As defendant observes, and as this Court has already noted, Turco has wholly failed either to establish a causal connection between his absenteeism and failure to follow proper procedures and his diabetes, or to demonstrate that accommodation by transfer would alleviate his particular performance problems. *See Id.* at 743. Moreover, unlike the transfer policy in *Buckingham*, the transfer policy at issue here directly relates to employees' qualifications and performance ratings. It is therefore considerably more relevant to the determination of whether plaintiff can perform the essential functions of the job and, in turn, to the decision of whether defendant has satisfied its "duty to comply with federal anti-discrimination law."

*Tuck*, the second case which plaintiff cites, involved a nurse who, having undergone back surgery, was transferred to a light duty position for eight weeks. Before the eight-week time period expired, the hospital terminated her, finding that she could not perform the required job responsibilities. Though the hospital cited a job description which included a requirement that Tuck be able to do heavy lifting, the Sixth Circuit concluded that summary judgment was inappropriate in

light of plaintiff's supervisors' apparent oral agreement to alter the job description for two months: "[T]he issue of what constituted the 'duties required by the employment sought' was a question of fact for the jury to decide." *Tuck*, 7 F.3d at 470. The court below was thus required "to conduct an individualized inquiry" of whether Tuck was "otherwise qualified" for the job. *Id.* at 471 (quoting *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987)). Unlike Tuck, however, Turco has not raised a fact question of whether the duties listed in the analyzer technician job posting are "indeed essential." *Cf. Id.* at 472. The ADA itself states that written job descriptions constitute probative evidence of the essential functions of the job. 42 U.S.C. § 12111(8). Moreover, unlike Turco, Tuck "was never told nor notified that her performance was unacceptable" and "[t]here were no reprimands or other negative reports in Mrs. Tuck's employee file either before or after her leave of absence." *Tuck*, 7 F.3d at 470, 473.

While Turco complains that defendant's decision to place him on written corrective action was itself discriminatory, the Court finds insufficient evidence of this in the record to create a submissible jury issue. Plaintiff claims that "other employees guilty of the very same infractions were not disciplined at all, much less terminated." But the evidentiary record belies this assertion. For example, plaintiff cites the testimony of Leo Bull, his former supervisor, in support of his contention that another operator, Tommy Page, mishandled an odor complaint in the same way that he had one month later and was not disciplined. Upon close perusal of the testimony, however, the Court finds that Bull testified only that Page filled out the same outdated form as plaintiff, not that he otherwise handled the incident in the same manner. Later in his deposition, Bull even seems to contradict himself, stating that "the form is the same," and that only the reporting procedure had changed. Such vague testimony does not suffice to support plaintiff's position that he was treated discriminatorily.

With respect to the fire-water hook-up, plaintiff claims that others guilty of the same

mistakes were not punished. To support this assertion, however, plaintiff only weakly insists that other operators knew that he had made the hook-up and did nothing to stop him. The record can scarcely support even this contention. While plaintiff claims that his step-up supervisor, Mike Wheeler, knew about the hook-up, he confesses that he did not tell Wheeler about it. He states only that Wheeler must have known because Wheeler was standing nearby as he explained the hook-up to another process operator. Even assuming that other operators knew that Turco had made a water hook-up, however, plaintiff provides no evidence, as defendant points out, that those operators knew the details of the hook-up, i.e. that plaintiff had hooked up the water to the *high pressure* side of the liquids incinerator. Furthermore, their knowledge, even assuming they possessed it, understandably could have subjected them to milder discipline than Turco, for it was he, not his fellow operators, who created the dangerous situation. Lastly, while Bull opined that the others should have been disciplined *if* they knew what plaintiff had done, he also testified that plaintiff's notes in the shift operator book failed to clarify precisely how the hook-up had been made.

Finally, plaintiff claims that he was unfairly disciplined with regard to the chemical exposure incident, because all of the process operators who testified—including Mike Wheeler and Roger Dale Tolley—admitted that they had suffered chemical exposures which they failed to report. Again, this evidence fails to demonstrate that plaintiff was unfairly disciplined. As defendant observes, plaintiff offers "no evidence that such infractions were ever made known to supervisory personnel.... Obviously, if an employee violates company policy and successfully conceals his actions, he cannot be disciplined." Thus, based upon the evidence which plaintiff proffers, the Court cannot find that plaintiff was discriminatorily subjected to disciplinary action for any of his procedural deviations. Indeed, the evidence which defendant submits confirms that similar violations have subjected other operators to disciplinary measures as well. Defendant supplies copies of documents from the personnel files of two employees. One employee failed to properly secure a vent valve and blind flange on a tank car, resulting in an ethylene glycol leak at Hoechst's plant in Greer, South Carolina; another employee misconnected hoses between a tank truck and pump, mistakenly reversing the flow, and caused the truck to fill and then overflow with 90 gallons of acrylic acid. As a consequence of their failure to follow proper procedure, both employees, like Turco, were subject to written corrective action.

The Human Resources Administrative Procedure sets out the approach normally taken in implementing corrective action "to bring about the desired change" in the job performance of employees who perform below the set standard. As plaintiff points out, paragraph one of the policy provides that "[c]orrective action should normally take the following steps: verbal counseling, written corrective action, final written corrective action, termination." The provision immediately thereafter holds, however, that "serious cases may warrant by-passing one or more steps." In response to plaintiff's complaint that the steps were not followed—that he was never formally verbally counseled nor issued a final written corrective action— plaintiff's supervisor Don Hardt cites this latter portion of the policy. Because Turco's fire-water hook-up created so grave a danger, and was so blatant a violation of standard operating procedure, Hardt explained during deposition, the steps of formal verbal counseling (which normally precedes written corrective action) and final written corrective action (which normally precedes termination) were skipped in accordance with the Plant's policy.

The termination records of several other plant employees, which defendant submits as evidence, indeed confirm that grave errors can prompt and have prompted the company to bypass certain steps in the corrective action procedure in order to terminate employees immediately. One of the terminated employees whose record defendant submits caused an environmental spill. Another, like plaintiff, created a situation "that *could* have resulted in serious injury to [the worker] and/or in a release" by failing to follow oper-

ating procedures and failing to wear protective gear. (Emphasis added). Noting "the seriousness of [the] incident," the company terminated him. While the termination letter of one of the employees indicates that he had been placed on Final Written Corrective Action, the letters of two others indicate that they were terminated, like Turco, solely in the wake of negative performance appraisals and unfulfilled performance improvement plans. Indeed, though Turco never received a "final" written warning, the record indicates that Turco was given ample notice of his shortcomings. His performance evaluations—which he signed—repeatedly cited a need for improvement, and Hardt, his supervisor, testified that he had verbally counselled Turco informally on more than one occasion.[9]

▮▮▮▮ Thus, while Turco apparently was being considered for daytime positions in spite of his negative performance record, the law does not obligate the company to take such a charitable approach. As an employer, Hoechst "is not required to fundamentally alter its program. Nor is the [company] required to find or create a new job for [plaintiff]. . . ." *Daugherty,* 56 F.3d at 700 (quoting *Chiari v. City of League City,* 920 F.2d 311, 318 (5th Cir.1991) (Rehabilitation Act case) (citations omitted)). In declining to transfer Turco to a new position in light of his deficient performance record, defendant Hoechst merely acted as it usually does: It followed its own transfer policy guidelines.

▮▮▮▮ In sum, Turco cannot demonstrate that his poor attendance record would have improved in a new job or that he could have performed his process operator functions had his shift been a daytime rather than rotating one. Hoechst was not legally obligated to "wait and see" whether a daytime position, or different medical treatment, would alleviate all of his performance problems. *See Fuller,* 916 F.2d at 562; *Myers,* 50 F.3d at 283–84. Turco does not attempt to show that the

person ultimately chosen to fill the technician position was less qualified than he. In fact, the Court notes that Turco has failed to show that any refusal upon defendant's part to accommodate him, or its ultimate decision to terminate him, was based upon discriminatory grounds. The record demonstrates that Hoechst employs other diabetics, including Mike Wheeler, who is a rotating shift operator, as well as several insulin-dependent diabetics. Moreover, Turco has not shown that any employee who for other reasons, such as single parenthood,[10] would have found a daytime position more suitable has been accommodated in the manner in which Turco requested to be accommodated. *See Daugherty,* 56 F.3d at 699 (finding that plaintiff's "ADA claim must fail because he did not show that he was treated differently from any other [similarly situated] part-time employee").

▮▮▮▮ Mr. Turco asks this Court to impose a legal obligation upon Hoechst Celanese—or to enable the jury to impose such an obligation—to create a special day-shift operator position for him or to retrain him and select him for the job of analyzer technician from among a pool of applicants despite his flawed employment record. The Court is not asked to judge whether such accommodations in the workplace are socially desirable; it must decide whether such accommodations are reasonable as a matter of law. The Court finds that they are not. The law does not impose upon employers an obligation to abandon all goals of profitability in order to pursue the philanthropical goal of providing work to ill or disabled employees. "The ADA simply does not mandate that an employer accept whatever reasonable accommodation a disabled employee may desire. . . ." *Williams v. City of Charlotte,* 899 F.Supp. 1484, 1488 (W.D.N.C.1995) (citing *Ansonia Bd. of Educ. v. Philbrook* 479 U.S. 60, 68, 107 S.Ct. 367, 371, 93 L.Ed.2d 305 (1986) (Title VII religion case)). Nor does the Act re-

---

9. While Turco disputes that this amounted to the "verbal counseling" envisioned by the corrective action policy, the Court nonetheless finds upon this record that, over the years, Turco was adequately apprised of his mistakes and his need to improve.

10. *See, e.g., Williams v. City of Charlotte,* 899 F.Supp. 1484, 1486 n. 1 (W.D.N.C.1995) (finding evidence in the record that plaintiff's shift work sleep disorder was "jointly caused by her work schedule and off-duty family commitments as a single mother").

quire "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less." *Daugherty,* 56 F.3d at 700.

Because Plaintiff John Turco has failed to show that he is a qualified individual with a disability, the Court finds that defendant Hoechst Celanese Chemical Group, Inc.'s motion for summary judgment should be GRANTED and that plaintiff John Turco's claims should be DISMISSED. It is so ORDERED.