Ronald R. YESKEY, Plaintiff,

v.

COMMONWEALTH OF PENNSYLVANIA, et al., Defendants.

No. CIV.A. 1:CV–95–2125.

United States District Court, M.D. Pennsylvania.

Dec. 14, 1999.

Jere Krakoff, Mitchell O'Brien & Krakoff, P.C., Pittsburgh, PA, L. Smith, Greensburg, PA, for plaintiff.

Sarah B. Vandenbraak, Mark E. Guzzi, PA Dept. of corrections, Office of Chief Counsel Lit. Sec., Camp Hill, PA, for defendants.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

This case presents the question whether the physical exercise required by a penal boot camp program is a "major life activity" under the Americans With Disabilities Act (ADA). 42 U.S.C. §§ 12131–12165.

The plaintiff, Ronald R. Yeskey, sued under Title II of the ADA, claiming that Pennsylvania prison officials violated the Act when they disqualified him from participating in Pennsylvania's boot camp program on the basis of high blood pressure, thereby preventing him from significantly shortening his period of incarceration.

The defendants are: the Commonwealth of Pennsylvania, Department of Corrections (Department); Joseph D. Lehman, former secretary of the Department; Jeffrey A. Beard, former superintendent of the State Correctional Institution at Camp Hill (SCI–Camp Hill); and Jeffrey K. Ditty, director of the Central Diagnostic and Classification Center, Unit No. 2 at SCI–Camp Hill.

By way of some procedural background, we had previously dismissed this case, ruling that the ADA did not apply to state prisons. The Third Circuit reversed, 118 F.3d 168 (3d Cir.1997), and the Supreme Court affirmed the Third Circuit's decision. 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998).

We are considering the defendants' motion for summary judgment, which among other things, argues that the plaintiff has no ADA claim because the physical exercise required by the boot camp program is not a major life activity under the Act. Since boot camp exercise is not a "major life activity," an essential element of an ADA claim, the plaintiff has no cause of action for his exclusion from the boot camp program, a cause of action based on the plaintiff's belief that the defendants regarded his high blood pressure as substantially limiting the major life activity of exercise.

We will examine the motion under the well-established standard. *See Showalter v. University of Pittsburgh Medical Center,* 190 F.3d 231, 234 (3d Cir.1999).

### II. *Background.*

Based on the parties' submissions, the following is the background to this litigation. In June 1992, the Department began operating a boot camp pursuant to Pennsylvania's Motivational Boot Camp Act. *See* 61 P.S. §§ 1121–1129 (Purdon 1999). The boot camp program requires a qualifying inmate to complete a six-month program of rigorous physical activity, intensive regimentation and discipline. *See* 61

P.S. § 1123. The inmate also does manual labor on public projects in a wilderness area around the boot camp. In return for successfully completing the program, the inmate is guaranteed parole at the end of the six months, regardless of any minimum sentence imposed. 61 P.S. § 1127. Acceptance into the program thus has an obvious benefit for an inmate.

As the name of the program makes clear, it imitates a military boot camp. The inmates are awakened at 5:30 a.m. to a heavily regimented day, which includes physical exercises taken from the United States Army and the United States Marine Corps manuals on physical fitness. The inmates also attend school and drug and alcohol therapy sessions.

Led by a trained physical fitness drill instructor, the physical-exercise sessions are conducted twice a day, seven days a week, for about one hour to a hour and 15 minutes each time. Typical exercises are jumping jacks, squat thrusts, mountain climbers and push-ups in multiple repetitions. For variety, the boot camp manual suggests "grass drills" as alternative exercises but cautions that there should be a 10 to 15 minute time limit on these drills since they are so strenuous. There is also instruction for marching in formation, but that takes up very little of each session's time compared to the exercises. Each session is followed by a minimum two-mile run in a military "double-time" formation, a pace of an eight and one-half minute mile for each mile run. An inmate is expected to improve on the two-mile distance as the training progresses.

Inmates are also assigned to work crews five days a week. The work crews are assigned manual labor jobs in wilderness areas surrounding the boot camp. Examples are stream restoration projects creating dams that involve cutting down large trees with nonpower saws, clearing plots of scrubs and small trees for elk feeder plots, and hauling stone and sand in wheel barrels.

On May 20, 1994, plaintiff began serving an 18 to 36 month sentence at SCI–Pittsburgh, with a recommendation from the sentencing judge that he be assigned to the boot camp program. Upon arrival at the prison, he was given a physical examination. His blood pressure reading was 140/96, considered high. On May 25, 1994, his blood pressure was taken again and read 145/100. After this second reading, a doctor diagnosed plaintiff with mild hypertension (high blood pressure) and prescribed Tenormin for a one-month period.

On May 27, 1994, the plaintiff was transferred from SCI–Pittsburgh to SCI–Camp Hill. He was interviewed for the boot camp and met all the qualifications except one. A prison doctor medically disapproved him based on his high blood pressure.

A boot camp selection committee chooses the inmates for the program, but it cannot override a doctor's medical decision. On June 16, 1994, the committee, including defendant Ditty, unanimously decided that Yeskey was ineligible for the boot camp program for two reasons. First, the plaintiff was medically disapproved because of a history of hypertension. Second, he had an outstanding detainer for the offenses of driving under suspension and driving under the influence. The detainer was apparently a mistake and was removed from Yeskey's records on June 30, 1994. Nonetheless, the plaintiff's blood pressure denied him entry into the boot camp.

Yeskey served his sentence in state prison, being paroled four months before his maximum sentence date. While incarcerated, plaintiff did not suffer from any impairment or ailments that limited his ability to engage in any programs, activities, or institutional work assignments that were available to all inmates within the general prison population.

III. *Discussion.*

A. *Whether the Individual Defendants Can Be Liable Under the ADA.*

■ The defendants argue that the individual defendants cannot be held liable for

violations of Title II of the ADA. In support, they cite *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999) (en banc), *petition for cert. filed*, 68 U.S.L.W. 3164 (U.S. Sept. 8, 1999) (No. 99–423); *Montez v. Romer*, 32 F.Supp.2d 1235, 1240 (D.Colo.1999); *Smith v. University of the State of New York*, 1997 WL 800882 (W.D.N.Y.); and *Randolph v. Rodgers*, 980 F.Supp. 1051, 1060 (E.D.Mo. 1997), *vacated, rev'd, and remanded on other grounds*, 170 F.3d 850 (8th Cir.1999). All of these cases have held that individuals cannot be liable for violations of Title II of the ADA. *But see Niece v. Fitzner*, 922 F.Supp. 1208 (E.D.Mich.1996).

The plaintiff has not opposed this aspect of the defendants' motion, and we agree with the cited cases. As reasoned by the Eighth Circuit in *Alsbrook*, individuals are not liable under Title II because it prohibits discrimination in programs of a "public entity" or discrimination "by any such entity," 42 U.S.C. § 12132, and "public entity" is not defined in Title II's definitional section, 42 U.S.C. § 12131, to include individuals. 184 F.3d at 1005 n. 8. The individual defendants are therefore entitled to summary judgment on this basis.[1]

B. *Whether the Physical Exercise Required By a Penal Boot Camp Program Is a "Major Life Activity" Under the ADA.*

Tracking the language of section 12132, we note that to establish a claim under Title II of the ADA, the plaintiff must show that he is a qualified individual with a disability who has been denied participation in the boot camp program by reason of the disability. In pertinent part, section 12132 provides that:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity.

Establishing a disability requires the plaintiff to show one of three things: "(A) a physical or mental impairment that substantially limits one or more of the major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). As the last provision shows, a plaintiff need not have an impairment, just be regarded as having one. *See Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 119 S.Ct. 2133, 2137, 144 L.Ed.2d 484 (1999) ("a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities").

At the start of this litigation, the plaintiff proceeded under the theory that he did have a disability and that the defendants had discriminated against him by not making a reasonable accommodation for his high blood pressure. Then the Supreme Court decided *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), which ruled that an impairment corrected by medication or other measures is not a disability as defined in the ADA because it would not substantially limit a major life activity.

The plaintiff now proceeds solely on the theory that, even though he was not disabled, the defendants mistakenly regarded him as having a disability and thus refused him entry into the boot camp program. Specifically, he argues that they regarded his high blood pressure as an impairment limiting the major life activity of exercise. In support, he cites *Rouse v. Plantier*, 997 F.Supp. 575 (D.N.J.1998), *vacated on other grounds*, 182 F.3d 192 (3d Cir.1999); *Mendez v. Gearan*, 956 F.Supp. 1520 (N.D.Cal. 1997); *Abbasi v. Herzfeld & Rubin, P.C.*, 1995 WL 303603 (S.D.N.Y.); and *Turco v.*

---

1. Because of our resolution of this issue, we need not decide if the individual defendants are entitled to qualified immunity, but if we had to decide that issue, we would resolve it in favor of the defendants.

*Hoechst Celanese Chemical Group, Inc.*, 906 F.Supp. 1120 (S.D.Tex.1995), as cases which have recognized exercise as a major life activity.

In moving for summary judgment, the defendants contest Yeskey's position that exercise satisfies this essential element of his claim. In their view, exercise is not a major life activity. The term "major life activity" is not defined in the statute, so the defendants begin with the regulatory definition of the term "major life activities" promulgated by the Attorney General for cases arising under Title II. The definition sets forth a nonexhaustive list of "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 28 C.F.R. § 35.104(2), all functions that can be grouped together as required for daily living.

■ The defendants then rely on judicial interpretations of the statutory term "major life activity" as it appears in the Act.[2] In *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144 (2d Cir.1998), the court stated:

> In the absence of a statutory definition, we construe statutory terms such as "major life activities" in accordance with their ordinary and natural meaning. *See Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 2053–54, 124 L.Ed.2d 138 (1993). The term "major life activit[y]," by its ordinary and natural meaning, directs us to distinguish between life activities of greater and lesser significance. *See Runnebaum*, 123 F.3d at 170 ("[A]n activity qualifies under the statutory definition as one of the major life activities contemplated by the ADA if it is relatively more significant or important than other life activi-

ties."); *Abbott*, 107 F.3d at 940 (dictionary definitions of the term "major" "strongly suggest that the touchstone for determining an activity's inclusion under the statutory rubric [of major life activity] is its significance").

*Id.* at 151 (brackets in original). *See also Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2205, 141 L.Ed.2d 540 (1998)(the word "major" denotes "comparative importance" and suggests the activity must have "significance")(quoted case omitted).

■ In *Reeves*, the court also noted that, in contrast to determining whether a disability exists, what constitutes a major life activity should not be decided on a case-by-case basis as it relates to a particular plaintiff; to do so would lessen the burden of showing a substantial limitation. Instead, a major life activity is determined independently of the plaintiff's situation. As the court put it: "We do not think that such major life activities as seeing, hearing, or walking are major life activities only to the extent that they are shown to matter to a particular ADA plaintiff." *Reeves, supra*, 140 F.3d at 152; *Colwell, supra*, 158 F.3d at 642; *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999), *cert. denied*, (—— U.S. ——, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999)).

Employing these principles, the defendants argue that:

> [P]articipation in Pennsylvania's boot camp program is not a major life activity. Engaging in rigorous squat thrusts, push-ups, jumping jacks, mountain climbers and two-mile military style formation runs are hardly comparable to the per se major life activities of caring for one's self, performing manual tasks,

---

**2.** These cases do not all deal with Title II of the ADA but the statutory definition applies to the entire act. Hence, the cases are relevant to defining "major life activity" for Title II. We also note that the definition for Title I (which deals with private employers), 29 C.F.R. § 1630.2(i), is identical to the definition in section 35.104(2). In sum, we take the same approach as other courts, to be "guided by interpretations of parallel definitions in previous statutes and the views of various administrative agencies that have considered these questions". *See Colwell v. Suffolk County Police Department*, 158 F.3d 635, 641 (2d Cir.1998)(internal quotation marks and quoted case omitted).

walking, seeing, hearing, speaking, breathing, learning and working.

(Defendants' supporting brief at p. 11)(brackets added).

The defendants acknowledge that it mattered greatly to the plaintiff that he enter the boot camp but, based on the foregoing cases, argue that the importance of an activity to an individual plaintiff is not sufficient. In their view, the physical activity required by the boot camp is not a major life activity because it is not significant or important that a person be able to perform it.

The plaintiff has two responses to this argument. First, as noted above, he argues that exercise has been held to be a major life activity. Second, he contends that the boot camp is not very rigorous, that it is "more like the description embodied in a memo from Jeffrey Ditty in which he depicted it as 'a more regimented and structured incarceration, which includes standing at attention, learning basic facing movements (about face, left face, right face, etc.)' and attending classes." (Opposition brief at p. 4)(footnote omitted).

We reject the plaintiff's first argument. None of the cases he cites support it. They do mention exercise but in a context with other activities that are major life activities under the ADA; none of them address exercise alone as major life activity. Additionally, in some of these cases the mention of exercise refers to the exercise of daily living.

For example, in *Rouse, supra,* a class of diabetic prison inmates were challenging the alleged denial of program participation. In deciding that the inmates had stated a claim for injunctive relief under the ADA, the court did note that the plaintiffs "may ... be substantially limited in the exercise regime which they can engage in," 997 F.Supp. at 581, but it also noted other life activities diabetes may impair: the types of foods the prisoners could eat, and, "perhaps most importantly," *id.,* activities affected "by the numerous special complications diabetes presents for them," *id.,* such as mobility and eyesight. *Id.* at 582.

This case does not assist the plaintiff because the court did not address whether exercise alone was a major life activity and the court did not specify what kind of exercise regime would be a major life activity. Indeed, it considered mobility and eyesight as more important activities.

The other cases can be similarly distinguished. In *Mendez, supra,* the plaintiff's depression "affected her ability to work, learn, socialize, sleep," as well as "exercise." 956 F.Supp. at 1524. In *Abbasi, supra,* the plaintiff alleged not only an inability to engage in work and "strenuous physical exercise," 1995 WL 303603 at *2, but also that he could "no longer walk up flights of stairs, stand for long periods of time, or carry heavy boxes or files." *Id.* Finally, in *Turco, supra,* the plaintiff's diabetes "rendered him unable to walk, to ride a bike, or to do any other type of physical exercise ..." 906 F.Supp. at 1129.

We also reject the plaintiff's second argument that the boot camp program does not require strenuous physical exercise and that it is mostly just marching in parade. The support for this allegation, a line or two taken from a memo written by defendant Ditty, is taken out of context and does not reflect the true nature of the program. There is some marching in military formation, but the uncontested deposition of the deputy commander at the boot camp establishes that the program is indeed rigorous. As noted above, it consists of about two hours of calisthenics and two runs of two miles or more seven days a week.

We agree with the defendants that this is strenuous physical exercise and that it is not a major life activity within the meaning of the ADA. As noted above, a major life activity must be significant or important relative to other activities. Strenuous physical exercise is not significant or important when compared to other life activities designated as major, such as walking,

seeing, hearing, speaking, breathing, learning, and working.

As the defendants have argued, "[a] major life activity also must be 'a basic activity that the average person in the general population can perform with little or no difficulty.'" *McAlindin v. County of San Diego,* 192 F.3d 1226, 1233 (9th Cir.1999)(quoting *Pack, supra,* 166 F.3d at 1305). The average person in the general population would not be able to perform the exercise required by the boot camp. Hence, it is not a major life activity.

Additionally, while the boot camp was an activity important to the plaintiff, an activity's importance to an individual plaintiff does not make it a major life activity under the ADA. *Reeves, supra,* 140 F.3d at 152; *Colwell, supra,* 158 F.3d at 642; *Pack, supra,* 166 F.3d at 1305.

Since the plaintiff has not satisfied one of the elements of his ADA claim, the claim must fail. "The statute is not operative ... unless the impairment affects a major life activity." *Bragdon, supra,* 524 U.S. at ——, 118 S.Ct. at 2204, 141 L.Ed.2d 540. We will issue appropriate order.