EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

TEXAS BUS LINES, Defendant.

Civ. A. No. H–95–3981.

United States District Court,
S.D. Texas,
Houston Division.

April 23, 1996.

Sharona Hoffman, EEOC, Houston, TX, for plaintiff.

James Edwards Byrom, Robinson Felts & Mashburn, Austin, TX, for defendant.

*MEMORANDUM AND ORDER GRANTING IN PART, AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY, AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

STACY, United States Magistrate Judge.

Pending before the Court is Plaintiff Equal Employment Opportunity Commission's Motion for Partial Summary Judgment on the Issue of Liability, filed on December 4, 1995 (Document No. 13), and Defendant's Motion for Summary Judgment, filed on February 26, 1996 (Document No. 24). On October 4, 1995, the parties in the above entitled matter consented to proceed to trial before United States Magistrate Judge Frances H. Stacy. Upon such consent, the United States District Judge transferred the case for all proceedings to Judge Stacy. Having considered the motions, the submissions of the parties, and the applicable law, the Court is of the opinion that Plaintiff's Motion for Partial Summary Judgment should be granted in part and denied in part, and Defendant's Motion for Summary Judgment should be granted in part and denied in part for the reasons set forth below.

## I. BACKGROUND

On August 3, 1995 the Equal Employment Opportunity Commission ("EEOC") filed suit alleging that Arazella Manuel ("Manuel") was subjected to disability discrimination by Defendant Texas Bus Lines. Manuel applied for employment at Texas Bus Lines on March 2, 1994. The position she applied for required Manuel to drive an eleven passenger van which would transport passengers between Houston hotels and the airports. (Document No. 13, Exhibit 3 at 20, Deposition of Samuel Visage). Subsequently, Manuel was interviewed, her references were checked, and she was given, and successfully passed, a road test in a vehicle identical to the one which she would be driving for Texas Bus Lines. (Document No. 13, Exhibit 3 at 20, Deposition of Samuel Visage). Manuel was then asked by Texas Bus Lines to undergo a physical examination as mandated by the Federal Motor Carrier Safety Regulations ("DOT Regulations"). *See* 49 C.F.R. Part 391. Among the numerous safety regulations set forth in Title 49 of the Code of Federal Regulations, part 391 requires all driver applicants to pass a physical examination to be conducted by a licensed health care professional meeting the standards of 49 C.F.R. § 391.43, and obtain a Medical Examiner's Certificate which must remain in the possession of the driver at all times. 49 C.F.R. § 391.43. Following her physical examination at the Caroline Clinic, the examining physician, Dr. James N. Frierson, found her to be "disqualified" and refused to issue the Medical Examiner's Certificate required by 49 C.F.R. § 391.41. Dr. Frierson concluded that as a morbidly obese woman,[1] Manuel would not be able to move swiftly in the event of an accident. Because Manuel failed to pass her physical examination and based on Dr. Frierson's finding of disqualification and refusal to issue the Medical Ex-

---

1. Manuel is a five foot seven inch woman, who weighed 345 pounds in March, 1994. The EEOC maintains that a person is considered to be morbidly obese if she weighs either more than twice her optimal weight or more than 100 pounds over her optimal weight. *Cook v. State of R.I.,* *Dept. of MHRH,* 10 F.3d 17, 20 n. 1 (1st Cir. 1993). According to medical charts, Manuel should weigh between 122 and 154 pounds. At 354 pounds, Manuel is clearly over twice her optimal weight and is considered morbidly obese. (Document No. 13 at 3).

aminer Certificate, Texas Bus Lines did not hire Manuel, claiming she was uninsurable as a bus driver.

## II. ARGUMENT OF THE PARTIES

In its Motion for Summary Judgment, the EEOC contends that Texas Bus Lines' refusal to hire Manuel constitutes a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, since Texas Bus Lines unjustifiably regarded Manuel as disabled. The EEOC maintains that during the course of Dr. Frierson's deposition, he testified that his conclusion about Manuel's mobility was based purely upon his observation that she had difficulty getting out of her seat in the waiting area, and that she "waddled" slowly to the examining room. (Document No. 13 at 4–6). Dr. Frierson admits that he has no specific training regarding the duties of bus drivers, motor vehicle safety, or the dynamics and consequences of various auto accidents. Additionally, Dr. Frierson allegedly acknowledged that morbid obesity is not itself a disqualifying condition for drivers under the DOT regulations. According to the EEOC, Texas Bus Lines withdrew its offer of employment to Manuel because it wrongly relied on Dr. Frierson's unsupportable refusal to issue a Medical Examiners Certificate and regarded her as disabled in violation of the ADA.

The EEOC also contends that, at the time Manuel applied for the bus driver position, Texas Bus Lines included in its employment application impermissible, pre-offer medical inquiries constituting a per se violation of the ADA. (Document No. 13 at 6–7). The form utilized by Texas Bus Lines at the time of Manuel's application[2] asked for information regarding any injuries the candidate has suffered on the job, any workmen's compensation claims made by the applicant, and the amount of time lost from work by the individual during the past three years due to illness. The EEOC alleges that such inquiries comprise a per se violation of section 102 of the ADA. (Document No. 13 at 19).

In response to the Motion for Partial Summary Judgment, Texas Bus Lines argues that its decision not to hire Manuel was based on her failing the required DOT physical examination. Texas Bus Lines maintains that Dr. Frierson has been conducting DOT physical examinations for driver applicants of motor carriers for over 40 years and, contrary to Plaintiff's assertions, its decision not to hire Manuel was based on Dr. Frierson's disqualification of Manuel and refusal to issue the mandatory Medical Examiner's Certificate required by 49 C.F.R. § 391.41. Additionally, Texas Bus Lines maintains that Manuel is not "disabled" as that term is defined by the ADA. Specifically, with respect to the EEOC's allegation that Texas Bus Lines regarded Manuel as disabled, Texas Bus Lines maintains that it "does not make any judgment about physical disqualifications of any driver applicant.... The only judgment made by [Texas Bus Lines] was that [it] could not hire Ms. Manuel, *not* because she was "disabled," but rather because she was DOT "disqualified," did not obtain the required Medical Examiner's Certificate, and was uninsurable." (Document No. 21 at 19). With respect to the pre-offer medical inquiries contained in the employment application. Texas Bus Lines maintains that "[t]he application form merely requests that the applicant 'list any physical defects such as eyesight, hearing, limb impairment, diabetes, back or heart trouble, high blood pressure, fits, convulsions, fainting, etc.'" Requests for such information, according to Texas Bus Lines is expressly addressed by the DOT regulations and therefore, the inclusion of the challenged inquiries in the employment application served a legitimate and nondiscriminatory job-related and business purpose. (Document No. 21 at 6–7).

## III. SUMMARY JUDGMENT STANDARD

The United States Supreme Court has held that Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an essential element of that party's case, and

---

**2.** The EEOC maintains that in September 1994, Texas Bus Lines began utilizing a new application form, which does not contain the alleged impermissible language.

on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). This standard provides that the mere existence of some factual dispute will not defeat a motion for summary judgment. *See Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir.1993); *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992). Rather, Rule 56 mandates that the fact dispute be genuine and material. *Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 314 (5th Cir.1995). The substantive law determines which facts are material, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), and the Court must view these facts and the inferences to be drawn from them in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Kelley v. Price–Macemon, Inc.*, 992 F.2d 1408, 1413 (5th Cir.1993); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986).

The party moving for summary judgment bears the initial burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–27, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986). Once this burden has been met, the non-moving party can resist the motion for summary judgment by making a positive showing that a genuine dispute of material fact does indeed exist and that it consists of more than bare allegations in briefs and pleadings. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54. "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). Once the parties have submitted evidence of contradictory facts, justifiable inferences are to be drawn in the light most favorable to the non-movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

Even if the standards of Rule 56 are met, a court may deny a motion for summary judgment if, in its discretion, it determines that "a better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Veillon v. Exploration Services, Inc.*, 876 F.2d 1197, 1200 (5th Cir.1989).

## IV. *THE AMERICANS WITH DISABILITIES ACT*

A plaintiff may establish a claim of disability discrimination by presenting direct evidence of discrimination. Alternatively, the indirect method of proof established for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), may also be utilized. *Grinstead v. Pool Co. of Texas*, 1994 WL 25515 (E.D.La.1994), *aff'd without opinion*, 26 F.3d 1118 (5th Cir.1994), *Aikens v. Banana Republic, Inc.*, 877 F.Supp. 1031, 1036–37 (S.D.Tex.1995).

██ A prima facie case of discrimination under the *McDonnell Douglas* analysis requires a plaintiff to show that he or she: (1) was "disabled" as that term is defined by the ADA, (2) is qualified, with or without accommodation, for the position sought, (3) was subject to an adverse employment action, and (4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *Norris v. Hartmarx Specialty Stores, Inc.*, 913 F.2d 253, 254 (5th Cir.1990), *EEOC v. Brown & Root, Inc.*, 688 F.2d 338, 340–41 (5th Cir.1982).

██ Once the plaintiff has established a prima facie showing of discrimination, the

burden shifts to the defendant who must articulate some legitimate non-discriminatory reason for its action that adversely affected the employee. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). While an employer need not prove the legitimate reason, it must produce some evidence to support its reason. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508–10, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993). The "[d]efendant's burden is merely one of production; the burden of proving that defendant's articulated reasons are pretextual and that discrimination was the real reason for the discharge remains at all times with the plaintiff." *Turco v. Hoechst Celanese Chemical Group, Inc.*, 906 F.Supp. 1120, 1126 (S.D.Tex.1995). If the defendant produces any evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action," then the defendant has satisfied its burden of production. *Id.*

 In order to prevail on an ADA claim, the plaintiff must meet the threshold burden of establishing that she is "disabled" within the meaning of the statute. *See Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995). Such an inquiry "is an individualized one, and must be determined on a case-by-case basis." *Byrne v. Board of Education*, 979 F.2d 560, 564 (7th Cir.1992). The ADA expansively prohibits discrimination in employment against qualified individuals with a disability. Specifically, the ADA provides, in relevant part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a); *Daugherty v. City of El Paso*, 56 F.3d 695 (5th Cir.1995), *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723 (5th Cir.1995).

· The parties admit that the issues presented in this case are questions of law for the Court. Specifically, the main issue for reso-

lution is whether an employer subject to the ADA can refuse to hire an individual with a perceived disability when that individual has been unjustifiably denied DOT certification by a physician whose sole basis for denying certification is the perceived disability. In other words, can an employer subject to both the ADA and the DOT regulations, who relies on an erroneous and clearly unsupported opinion of a physician conducting a DOT physical examination be exonerated from liability under the ADA? The secondary issue for resolution is whether the medical inquiry contained in the application form used by Texas Bus Lines was violative of the ADA.

In resolving the first issue, using the uncontroverted facts of this case, the Court must determine 1) whether Manuel was a qualified individual under the ADA; that is, whether she was qualified for the position; 2) whether Manuel was disabled within the meaning of the ADA, or was perceived as disabled within the meaning of the ADA; and 3) whether Texas Bus Lines' refusal to hire Manuel was job-related, was based on business necessity, or was necessitated by health and safety concerns. With regard to the second issue, the Court must determine, as a matter of law, whether the medical inquiry contained in the employment application used by Texas Bus Lines sought medical information about the applicant's ability "to perform job-related functions."

### A. MANUEL WAS A "QUALIFIED INDIVIDUAL" UNDER THE ADA

A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Regulations To Implement The Equal Employment Provisions Of The Americans With Disabilities Act (hereinafter the "Implementing Regulations"), further provide that:

> the determination of whether an individual with a disability is "qualified" should be made in two steps. The first step is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational back-

ground, employment experience, skills, licenses, etc. ... The second step is to determine whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation.

29 C.F.R. § 1630.2(m).

 Based on the evidence presented by the parties, the Court finds that Manuel was qualified for the position of driver. Larry Evans, a manager for Texas Bus Lines, who conducted Manuel's initial interview and decided to hire Manuel, found her to be very impressive. (Deposition of Larry Wayne Evans, Document No. 23, Exhibit 7 at 19). Mr. Evans was impressed by her job experience and by the references provided by her former employers. During her one-half hour interview, Mr. Evans found Manuel to be "very personable" and concluded that she would be courteous and pleasant to passengers. (Deposition of Larry Wayne Evans, Document No. 23, Exhibit 7 at 19–22). Mr. Evans further testified that Manuel's driving record was "clean." Additionally, Mr. Evans stated that he did not notice Manuel moving awkwardly when she entered the room and sat down, and did not think she was heavier than many of the other drivers hired by Texas Bus Lines. (Deposition of Larry Wayne Evans, Document No. 23, Exhibit 7 at 18, 24–26). In fact, Mr. Evans was so convinced by Manuel's qualifications, that he extended a conditional offer of employment to her. (Deposition of Larry Wayne Evans, Document No. 23, Exhibit 7 at 18–19).

Mr. Visage, Texas Bus Lines' Vice President of Operations, provides further support of Manuel's qualifications for the position of driver. In his affidavit, Mr. Visage states unequivocally that "Ms. Manuel would have been hired by [Texas Bus Lines] solely but for her failure to pass the physical/medical examination and to obtain the Medical Examiner's Certificate." (Affidavit of Samuel J. Visage, Document No. 21, Exhibit A at 7). Of further significance is that Manuel successfully passed the road test administered by Texas Bus Lines, and was deemed qualified with respect to all of the tasks she was asked to perform. (Certification of Road Test, Document No. 13, Exhibit 4).

Although Texas Bus Lines argues that Manuel was not "qualified" for the position because she had not received DOT certification as was required for the position, the evidence before the Court shows that the only obstacle to the required DOT certification was both Texas Bus Lines and Dr. Frierson's perceived and mistaken belief that Manuel was disabled as a result of her obesity. Texas Bus Lines maintains that Dr. Frierson's opinion that "Patient can't move around swiftly in case of an accident. (Does not meet DOT regulations)" (Document No. 13, Exhibit 1, Medical Examination Form), which formed the entire basis of Manual's failure to pass her physical examination, rendered her unqualified for any driving position subject to DOT regulations. This argument fails in light of the DOT regulations themselves, which do not provide for the disqualification of drivers solely on the basis of their obesity. Moreover, Texas Bus Lines' argument fails in light of the clearly distinguishable cases it cites in support of its argument.

In order to comply with DOT Regulations, each professional driver must acquire a physician's certificate, stating that they are physically qualified to drive a motor vehicle. 49 C.F.R. § 391.41 provides with respect to a driver's physical qualifications:

(a) A person shall not drive a commercial motor vehicle unless he/she is physically qualified to do so and, except as provided in § 391.67, has on his/her person the original, or a photographic copy, of a medical examiner's certificate that he/she is physically qualified to drive a commercial motor vehicle.

(b) A person is physically qualified to drive a commercial motor vehicle if that person—

(1) Has no loss of a foot, a leg, a hand, or an arm, or has been granted a waiver pursuant to § 391.49;

(2) Has no impairment of:

(i) A hand or finger which interferes with prehension or power grasping; or (ii) An arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or any oth-

er significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or has been granted a waiver pursuant to § 391.49.

(3) Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control;

(4) Has no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure.

(5) Has no established medical history or clinical diagnosis of a respiratory dysfunction likely to interfere with his/her ability to control and drive a commercial motor vehicle safely;

(6) Has no current clinical diagnosis of high blood pressure likely to interfere with his/her ability to operate a commercial motor vehicle safely;

(7) Has no established medical history or clinical diagnosis of rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease which interferes with his/her ability to control and operate a commercial motor vehicle safely;

(8) Has no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle;

(9) Has no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely;

(10) Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70 degrees in the horizontal Meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber;

(11) First perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5—1951.

(12) Does not use a Schedule I drug or other substance identified in appendix D to this subchapter, an amphetamine, a narcotic, or any other habit-forming drug, except that a driver may use such a substance or drug if the substance or drug is prescribed by a licensed medical practitioner who is familiar with the driver's medical history and assigned duties and who has advised the driver that the prescribed substance or drug will not adversely affect the driver's ability to safely operate a commercial motor vehicle; and

(13) Has no current clinical diagnosis of alcoholism.

In performing the physical examination required for medical certification under the DOT Regulations, the physician is to take into consideration the instructions contained in the Regulations at 49 C.F.R. § 391.43. With regard to an individual's general appearance, the regulations instruct the physician to:

Note marked overweight. Note any posture defect, perceptible limp, tremor, or other defects that might be caused by alcoholism, thyroid intoxication, or other illnesses. The Federal Motor Carrier Safety

Regulations provide that no driver shall use a narcotic or other habit-forming drugs.

Although Texas Bus Lines relies almost exclusively on this instruction in arguing that its reliance on Dr. Frierson's opinion was proper, it is clear from the instructions as a whole that obesity, in and of itself, does not disqualify an individual from obtaining a medical certificate under 49 C.F.R. §§ 391.41, 391.43.[3] Dr. Frierson himself admits that the DOT Regulations do not disqualify an individual solely on the basis of weight. (Document No. 21, Exhibit B, at 35–36).[4]

Dr. Frierson reported to Texas Bus Lines that Manuel could not "move around swiftly in case of an accident (Doesn't meet DOT regulations." When Larry Evans, a manager for Texas Bus Lines, interviewed Manuel, he did not notice Manuel moving awkwardly when she entered the room and sat down, and did not think she was heavier than many of the other drivers hired by Texas Bus Lines. At his deposition, Mr. Visage, Texas Bus Lines' Vice President of Operations, testified that he was familiar with the DOT Regulations. (Document No. 25, Exhibit 5, at 16–17). Given Visage's professed knowledge of the DOT Regulations, it was improper for Texas Bus Lines to rely on the erroneous and subjective opinion of Dr. Frierson regarding Manuel's physical qualification for the driver position. Visage knew or should have known that the DOT regulations neither establish any weight restrictions for bus drivers, nor do they mandate that individuals be disqualified due to excessive weight. Because Texas Bus Lines could determine from Dr. Frierson's examination report that his opinion was not supported by any objective medical findings and because Texas Bus Lines knew or should have known that Dr. Frierson's conclusion that Manuel was not physically qualified for the driver position was not based on the DOT Regulations, Texas Bus Lines' reliance on Dr. Frierson's opinion was unreasonable. Texas Bus Lines knew or should have known that its refusal to hire Manuel on the basis of Dr. Frierson's faulty opinion was both improper and violative of the ADA.

The ADA specifically imposes liability in cases such as this:

As used in subsection (a) of this section, the term "discriminate" includes—

3. Additional instructions advise physicians to note significant medical problems, but further advise when additional testing should be done to determine whether an individual is qualified to drive a commercial vehicle. For example, a physician is instructed with respect to an individual's blood pressure, abdominal evaluation, and extremities evaluation, when additional objective testing may be required to determine whether an individual can be certified. There is no such guidance with respect to weight, indicating that weight alone does not disqualify an individual. 49 C.F.R. § 391.43.

4. Dr. Frierson testified at his deposition:

Q: Do you know where the DOT regulations tell you that agility is a concern for drivers?

A: Yes, on 391.43. It's page 121 in my book.

Q: To what are you referring?

A: Well, this is my copy of the same thing; and it's one page 120.

Q: Okay. What—could you read me the passage that's relevant?

A: Okay. Let's go down to the last paragraph. It says, "The examining health care professionals should be aware of the rigorous demands placed upon the driver of a commercial motor vehicle. In the interest of public safety, the examining health care professional is required to certify that the driver does not have any physical defects such as to affect the driver's ability to operate safely a commercial motor vehicle." And in the next paragraph it says, "The purpose of this history and physical examination is to detect the presence of physical defects of such character and extent as to affect the applicant's ability to operate a motor vehicle safely." Second paragraph, "General appearance and development, note marked overweight."

Q: Does it say that marked overweight disqualifies a person?

A: It does not say that specifically here.

Q: Okay. Are there any other provisions upon which you rely?

A: Mostly agility and weight.

Q: So, you rely on the provisions that you read to me in making your determinations regarding obese people?

A: Correct.

Q: Okay. Is there any other regulation or authority which deems overweight people to be disqualified?

A: Well, I think common sense has a lot to do with it, experience.

(Document No. 21, Exhibit B, at 34–36).

(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter.

42 U.S.C. § 12112(b)(2). Because Texas Bus Lines' relationship with Dr. Frierson resulted in the discriminatory rejection of Manuel, an individual protected by the ADA, Texas Bus Lines is liable for a violation of the ADA.

The cases cited by Texas Bus Lines in support of its argument that its refusal to hire Manuel was based on the inability of Manuel to become DOT certified reveal the weakness of Texas Bus Lines' position. In *Daugherty v. City of El Paso*, 56 F.3d 695, 698 (5th Cir.1995) and *Chandler v. City of Dallas*, 2 F.3d 1385 (5th Cir.1993), the Fifth Circuit Court of Appeals held that city bus drivers who were found to have insulin dependent diabetes or impaired vision were per se not qualified for their positions and therefore could not prevail on their disability discrimination claims brought under the ADA or the Rehabilitation Act when they were terminated. According to the Fifth Circuit, insulin dependent diabetes and impaired vision were both conditions which, as a matter of law, affected an individual's ability to drive a bus, thereby disqualifying those individuals from those positions. Although the result reached in both *Daugherty* and *Chandler* is the result urged by Texas Bus Lines in this case, in *Daugherty* and *Chandler*, the disqualifying condition was disqualifying per se. That is, Federal Highway Administration Regulations listed both insulin dependent diabetes and impaired vision as conditions which per se disqualified individuals from being employed as city bus drivers. Had the plaintiffs in *Daugherty* and *Chandler* applied for a position with Texas Bus Lines, both would have been per se disqualified under DOT Regulations. 49 C.F.R. § 391.41(b)(3)(10). In contrast to the per se disqualifying conditions discussed in *Daugherty* and *Chandler*, there is no per se disqualification for an individual, such as Manuel, who is obese. *See* 49 C.F.R. § 391.41. Moreover, there is no indication in the medical examiner's instructions of the DOT Regulations which would support a disqualification on the basis of obesity alone.

Based on the foregoing, the Court finds that Manuel was a "qualified individual" under the ADA. Texas Bus Lines' argument that Manuel was not qualified under DOT regulations for the driving position solely on account of her weight is neither supported by the objective medical findings nor the DOT Regulations.

**B. MANUEL WAS PERCEIVED OR REGARDED AS "DISABLED"**

Pursuant to the ADA, an individual is considered to have a disability if that individual either has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," or has "a record of such an impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(2). The Implementing Regulations define the term "major life activities" to mean "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The provision further states that with respect to the major life activity of working:

The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(i)(3)(i).

The Implementing Regulations of the ADA provide that "being regarded as having such an impairment," the third prong of the definition of disability, means that the plaintiff:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(1).

The rationale for the "regarded as" part of the definition of the disability was articulated by the Supreme Court in the context of the Rehabilitation Act of 1973 in *School Board of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). The Court noted that, although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling. "Such an impairment might not diminish a person's physical or mental capacities, but nevertheless substantially limits that person's ability to work as a result of the negative reactions of others to the impairment." *Arline*, 480 U.S. at 283, 107 S.Ct. at 1128–29. The Court concluded that by including "regarded as" in the definition of disability, "Congress acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." *Arline*, 480 U.S. at 284, 107 S.Ct. at 1129; *see also Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538, 541 (7th Cir. 1995); *Howard v. Navistar Int'l, Transportation Corp.*, 904 F.Supp. 922, 930 (E.D.Wis. 1995).

■ An individual rejected from a job because of the "myths, fears and stereotypes" associated with disabilities would be covered under the "regarded as" section of the definition of disability whether or not the employer's perception was shared by others in the field and whether or not the individual's actual physical or mental condition would be considered a disability under the first or second part of the definition. Therefore, if an individual "can show that an employer … made an employment decision because of a perception of disability based on 'myth, fear or stereotype,' the individual will satisfy the 're-garded as' part of the definition of disability. If the employer cannot articulate a nondiscriminatory reason for the employment action, an inference that the employer is acting on the basis of 'myth, fear or stereotype' can be drawn." The Interpretive Guidance On Title I of the Americans With Disabilities Act, Appendix to Part 1630 (hereinafter referred to as "Interpretive Guidance on the ADA"), 29 C.F.R. Pt. 1630 app. § 1630.2(1).

■ In order to prevail on the perceived disability theory, a plaintiff must show either that (1) while she had a physical or mental impairment, it did not substantially limit her ability to perform major life activities, or alternatively, that (2) she did not suffer at all from a statutorily prescribed physical or mental impairment, however, the defendant employer treated the impairment (whether actual or perceived) as substantially limiting one or more of her major life activities. *Cook v. State of R.I. Dept. of MHRH*, 10 F.3d 17, 18–19 (1st Cir.1993) (interpreting a comparable provision of the Rehabilitation Act of 1973).[5]

■ Contrary to Defendant's assertions, the EEOC does not contend that Manuel is protected by the ADA because she is actually disabled. Rather, the EEOC contends that Texas Bus Lines declined to employ Manuel because it **regarded** her as disabled in violation of the ADA. In fact, the courts as well as the ADA have consistently rejected obesity as a disability protected by the ADA. For example, in *Torcasio v. Murray*, 57 F.3d 1340, 1354 (4th Cir.1995), having reviewed recent case law, the Court found that obesity alone is not a disability under the ADA. Similarly, in *Smaw v. Virginia Dep't of State Police*, 862 F.Supp. 1469, 1475 (E.D.Va.1994), the Court held that "the case law and the

5. Cases interpreting the Rehabilitation Act are often applied to the ADA, a much newer law for which only a limited body of interpretive law exists. The Code of Federal Regulations establishes that, in general, the regulations promulgated to implement the ADA, do "not apply a lesser standard than the standard applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. §§ 790–794a), or the regulations issued by Federal agencies pursuant to that title." 29 C.F.R. § 1630.1(c). Additionally, the Rehabilitation Act itself provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 1211 *et seq.*)...." 29 U.S.C. § 794(d).

regulations both point unrelentingly to the conclusion that a claim based on obesity is not likely to succeed under the ADA." Additionally, the Interpretive Guidance on the ADA provides that "except in rare circumstances, obesity is not considered a disabling impairment." 29 C.F.R. Pt. 1630 App., § 1630.2(j). Clearly, neither the case law nor the applicable regulations include morbid obesity as a disability under the ADA.

In the instant case, EEOC proceeds on the "regarded as" or perceived disability theory, asserting that Manuel was fully able, although Texas Bus Lines regarded her as physically impaired. Specifically, the EEOC maintains that while Manuel had no physical or mental impairments, she was treated by Texas Bus Lines as having a substantially limiting impairment. 29 C.F.R. § 1630.2(1). It is undisputed that Texas Bus Lines' refusal to hire Manuel was based on the findings of disqualification by Dr. Frierson. In his affidavit, Vice President of Operations for Texas Bus Lines, Samuel Visage, avers:

> Ms. Manuel would have been hired by [Texas Bus Lines] solely but for her failure to pass the physical/medical examination and to obtain the Medical Examiner's Certificate. Our decision was purely and solely based on Dr. Frierson's conclusion that she was *not physically qualified* under Department of Transportation Regulations, his refusal to provide the Medical Examiner's Certificate without which a driver cannot drive and her uninsurability as a result thereof.

(Affidavit of Samuel J. Visage, Document No. 21, Exhibit A at 7, emphasis added). Most notable, however, was the statement offered by Samuel Visage, during his deposition, in response to a question about who made the final decision not to hire Manuel, Mr. Visage stated: "[Manuel] . . . needed to go do something else in life. You know, she couldn't drive for us or any other company that was regulated by DOT at this point in time." (Deposition of Samuel J. Visage, Document No. 13, Exhibit 3 at 64). Additionally, when questioned about the kind of observations Dr. Frierson made of Manuel's mobility, Samuel Visage answered "none," and that Dr. Frierson informed him that Manuel "was

disqualified physically. . . ." (Deposition of Samuel Jackson Visage, Document No. 13, Exhibit 3 at 60).

During his deposition, Dr. Frierson testified as follows:

Q: Have you received any training in Equal Employment Opportunity Matters?

A: I have not.

Q: Have you received any training with respect to the Americans with Disabilities Act?

A: I have not.

Q: Have you received any training with respect to DOT regulations?

A: I have not had any special courses, if that's what you mean; but I have read the DOT regulations that have changed from time to time over 42 years. . . .

Q: Do you consider yourself to be familiar with them now?

A: Yes. . . .

Q: Could you please describe, please, the medical exams which you conduct for Texas Bus Lines' applicants? . . .

A: In the women we do a brief eye, ear, nose, throat examination; and prior to this the girls have taken their weight, their height, urine examination, probably a drug examination or alcohol examination. And then the doctor—we bring them in. First we watch them. When I call their name up front, I watch them get up out of their chair. That tells me a good deal; and I watch how they walk back to the office, how they sit down, how they undress—well, women, we don't undress them. . . . And then we take their blood pressure and listen to their heart. We take their pulse. That's essentially what we do on the females.

Q: Uh-huh. How long does this medical exam take?

A: Oh, probably five minutes.

Q: Who decided the scope of this exam?

A: Well, the DOT regulations has it pretty well outlined in their—on the histo-

ry and the physical examination; and of course, they have already filled out a rather detailed history.

Q: Has Texas Bus Lines provided you with any training concerning these examinations?

A: None.

Q: Have they given you any materials?

A: Oh, they furnish us with the DOT regulations, which we already have a copy of.

Q: Do they discuss with you the duties of their bus drivers?

A: No, I have a pretty good idea what it takes to drive a bus.

Q: How did you obtain this idea?

A: Well, I've ridden buses....

Q: Has Texas Bus Lines ever provided you with a list of essential or marginal functions of a bus driver.

A: Not to my knowledge....

Q: Is it your understanding that you are solely responsible for determining whether a candidate is qualified under DOT regulations?

(An objection was posed on the basis that the question called for legal conclusion. However, Dr. Frierson was allowed to answer the question).

A: I'm not—you mean am I the only person that is qualified? No, they can go anywhere they want to and get a DOT examination.... That's just my personal opinion.

Q: Right. But once they come here, are you the person who determines whether they meet DOT qualifications or is there some other step they take?

A: On that one examination, yes.

Q: Is there something else that's involved.

A: Sometimes the companies go—I fail them on the DOT. The companies go ahead and hire them anyway. I mean, they can do what they want to do. I'm just giving my opinion....

Q: You stated before we were interrupted that sometimes you tell the company someone isn't qualified, and they hire the person anyway for a driving position; is that correct?

A: That happens. It happens quite frequently.... They can simply send them somewhere else....

Q: Do you remember when you conducted Ms. Manuel's physical exam?

A: It says 3/8/94....

Q: What were the results of her examination?

A: Well, the results of the examination began when she was seated up in the waiting room; and I called her name. And I noticed that she had some difficulty in getting up out of a chair; and it took her, I would say an abnormally long time to get to this office from the front of the clinic. She was literally waddling down the hall; and I would say it took her, oh, roughly five times as long as it would somebody else. That's part of the examination, as I watch them walking down that hall and get up out of a chair. She had difficulty. She was waddling.

Q: What does it mean to waddle?

A: She wasn't walking. To waddle means you turn your hips and then you turn your hips. In other words, you don't walk in a straight manner because your thighs are too big. You can't do that. So, I got her back here and examined her; and I noted that her weight was 345. She was 5 foot 7. Her—her blood pressure was normal—I was surprised—145 over 90, pulse 76. She said she hadn't had any prior injuries or operations. Urine was negative. She had already had her blood screen drawn.

Q: Other than her weight, did she have any medical problem at all?

A: Not that I know of.

Q: How much time did you spend with Ms. Manuel?

A: Well, after I got her back to the office, I imagine five or six minutes.

Q: Other than watching her walk to the office, did you conduct any other agility test on her or mobility test?

A: I didn't think they were indicated.

Q: You concluded that she was not agile simply based on observing her getting out of the chair and walking or waddling to the room here, yes?

A: Well, it was my opinion that as a physician I owe the public and other people the right to have a driver that can give them some protection in case of an accident or fire or something like that. . . .

Q: So, that's based on your own subjective conclusions?

A: That's my opinion.

(Deposition of Dr. James N. Frierson, Document No. 13, Exhibit 5 at 11–28).

The physical examination revealed no medical problems of any kind. Dr. Frierson's conclusion that Manuel would not move around swiftly in case of an accident was clearly not a medical opinion and was not based upon any medical tests or findings. To the contrary, Dr. Frierson admitted his failure to conduct agility tests to affirm his subjective beliefs that Manuel would not be able to move about swiftly. He did nothing to rule out the possibility that Manuel had simply decided to walk slowly because she had grown tired of sitting in the waiting room, or because her foot had fallen asleep, or some other temporary, non-impairing reason. Additionally, the examination revealed no significant medical problems with Manuel. This finding is substantiated by the medical examination form which states that Manuel was assessed as being "normal" in all categories. (Document No. 13, Exhibit 1, Medical Examination Form). The only indication of a problem with Manuel's physical condition is noted in the doctor's certification which states: "Patient can't move around swiftly in case of an accident. (Does not meet DOT regulations)." (Document No. 13, Exhibit 1, Medical Examination Form). However, Dr. Frierson admitted that he spent approxi-

mately five or six minutes examining Manuel, conducted no further testing of Manuel's agility and mobility, and based his conclusion about Manuel's mobility purely upon his observation that she had some difficulty getting out of her seat in the waiting area and that she "waddled" slowly to the examining room, eight doors away. (Deposition of Dr. James N. Frierson, Document No. 13, Exhibit 5 at 26–27). Additionally, when questioned as to whether obesity could be symptomatic of other ailments, Dr. Frierson answered yes, and stated that obesity could indicate a thyroid, ovarian, or hormonal problem. However, Dr. Frierson found no evidence of any such ailments in Manuel that could have caused the obesity. (Deposition of Dr. James N. Frierson, Document No. 21, Exhibit B at 29).

Texas Bus Lines again maintains that it was Manuel's inability to pass the required DOT medical examination which prompted the decision not to hire Manuel. It is undisputed that Texas Bus Lines is subject to the DOT regulations that require professional drivers to have a medical examiner's certificate. However, based on Dr. Frierson's deposition testimony that his conclusion was merely a recommendation and that Texas Bus Lines was free to turn to a different doctor, as other employers have done when they disagreed with his conclusion, the Court finds that Texas Bus Line's contention is without merit. Once Texas Bus Lines was notified [6] of Dr. Frierson's decision to disqualify Manuel based on her alleged impaired mobility, Texas Bus Lines could have sent Manuel to another physician.

Moreover, Texas Bus Lines was placed on notice that Dr. Frierson's findings were inconsistent with the DOT regulations. The DOT regulations do not establish any weight restrictions for bus drivers and do not mandate that individuals be disqualified due to excessive weight. Furthermore, the DOT regulations do not per se list impaired mobility as a disqualifying condition. Rather, the regulations specify that a driver must not have an impairment of "[a]n arm, foot, or leg which interferes with the ability to perform

---

**6.** During his deposition, Dr. Frierson testified that his office called Texas Bus Lines to inform them that Manuel had failed the physical. (Deposition of Dr. James N. Frierson, Document No. 21, Exhibit B at 28).

normal tasks associated with operating a motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a motor vehicle." Department Of Transportation Regulations, 49 C.F.R. Pt. 391, § 391.41(a)(2)(ii). Texas Bus Lines, in reliance on Dr. Frierson's findings, impermissibly withdrew its offer of employment because it regarded Manuel as disabled.

Based on the foregoing, the Court finds that Dr. Frierson's decision not to medically clear Manuel for employment was not based on a DOT disqualifying condition. Texas Bus Lines made the decision not to hire Manuel because of a perception of disability based on 'myth, fear or stereotype.' *See* Interpretive Guidance on the ADA, 29 C.F.R. Pt. 1630 app. *et seq.* Texas Bus Lines regarded Manuel as disabled and, therefore, unable to work as a driver based on her alleged impaired mobility without the benefit of objective medical testing or findings. Texas Bus Lines' blind reliance on a very limited medical examination of Manuel by Dr. Frierson is misplaced and cannot be used as a justification to circumvent the anti-discrimination mandate of the ADA.

## C. TEXAS BUS LINES' REFUSAL TO HIRE MANUEL WAS NOT JOB–RELATED, WAS NOT BASED ON A BUSINESS NECESSITY, AND WAS NOT NECESSITATED BY HEALTH AND SAFETY CONCERNS

As defenses to the ADA claims brought against it, Texas Bus Lines maintains that it had a legitimate nondiscriminatory reason for its employment decision. Specifically, Texas Bus Lines claims that its required compliance with the DOT Regulations precluded it from hiring Manuel, an individual who was unable to obtain DOT certification. For this reason, Texas Bus Lines maintains that its decision not to hire Manuel was both job-related and based on business necessity. Additionally, Texas Bus Lines claims that Manuel's limited mobility impaired her ability to act quickly in case of an accident. Each of these arguments implicates the defenses to the ADA, which are set forth at 42 U.S.C. § 12113(a) & (b).

The ADA provides:

(a) **In general.** It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be *job-related* and consistent with *business necessity,* and such performance cannot be accomplished by reasonable accommodation, as required by this subchapter.

(b) **Qualification standards.** The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the *health or safety* of other individuals in the workplace.

42 U.S.C. § 12113(a) & (b). The Implementing Regulations further provide:

*Direct Threat* means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job.... In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk;

(2) The nature and severity of the potential harm;

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).

With regard to Texas Bus Lines' "job-related" and "business necessity" defenses, which are based on Texas Bus Lines' belief that it could not hire Manuel and comply with DOT Regulations, the evidence establishes that any such belief on Texas Bus Lines' part was wholly unreasonable. The regulations promulgated under the ADA specifically provide that "[t]he results of such [medical] examination shall not be used for

any purpose inconsistent with [the ADA]." 29 C.F.R. § 1630.14(b)(2). Additionally, the ADA prohibits employers from "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by [the ADA]." 42 U.S.C. § 12112(b)(2). In *Piquard v. City of East Peoria*, 887 F.Supp. 1106, 1124 (C.D.Ill.1995), the court explained that "[s]ection 12112(b)(2) was merely intended to prohibit an entity from doing through a contractual relationship what it may not do directly." Dr. Frierson's refusal to issue a medical certification to Manuel was not grounded on DOT Regulations and does not justify Texas Bus Lines' discriminatory rejection of Manuel, based on Texas Bus Lines' perception of Manuel's disability. Thus, the "job-related" and "business necessity" defenses are inapplicable to the instant case where Texas Bus Lines' reliance on the findings of the examining physician was wholly inconsistent with the DOT regulations.

With regard to the health and safety defense, and Texas Bus Lines' argument that Manuel would pose a direct threat to the safety of her passengers due to her alleged impaired mobility, the Court finds this argument also to be without merit. Dr. Frierson based his refusal to certify Manuel on DOT Regulations because he did not believe that Manuel could "move around swiftly in case of an accident ..." (Document No. 13, Exhibit 1, Medical Examination Form). The DOT Regulations, however, do not address the issue of a driver's ability to handle emergency situations. Moreover, there is no evidence in the record to show that Manuel, solely because of her obesity, would not be able to handle an emergency situation and would thereby jeopardize the health and safety of her passengers.

Mr. Visage testified that the vehicle to be driven by Manuel was one with a passenger door at its side that could easily be opened by the passengers themselves in the event they needed to exit the vehicle in an emergency. Such vehicles have driver-side doors adjacent to the driver's seat. (Deposition of Samuel J. Visage, Document No. 13, Exhibit 3 at 20). Furthermore, there is no evidence that Manuel would have experienced difficulty in exiting her vehicle. To the contrary, according to her Certification of Road Test, Manuel correctly exited the vehicle, without any marked difficulty, checked and re-checked conditions before backing the vehicle. (Certification of Road Test, Document No. 13, Exhibit 4). In response to a question regarding Manuel's potential difficulties in reaching and opening the electrical door opener in case of an accident, Mr. Raymond Oatis, the individual who administered the road test to Manuel and who tests 90% of the Texas Bus Lines applicants signed the following statement on the Driver Certification form: "It is my considered opinion that this driver possesses sufficient driving skill to operate safely the type of commercial motor vehicle listed above [a van]." (Certification of Road Test, Document No. 33, Plaintiff's Reply to Defendant's Response, Exhibit 3). Mr. Oatis also marked Manuel as qualified with respect to brake operation, driving posture, getting in and out of the van to check before backing, and physical stamina. Based on the foregoing, the Court finds that the likelihood of potential harm as a result of Manuel's weight impeding her service to her passengers is too remote and does not constitute grounds for a viable defense under the ADA. Despite Texas Bus Lines' assertions that Manuel posed a "direct threat" to the "men, women and children passengers" that it transports, such theoretical concerns do not serve as a basis for the direct threat defense. An employer cannot assert a direct threat defense unless it makes a showing of a reasonable probability of substantial harm. *Dept. of Labor v. Texas Industries*, 47 FEP Cases 18, 27 (1988).

In *Cook v. State of Rhode Island, Department of Mental Health, Retardation, and Hospitals*, 10 F.3d 17 (1st Cir.1993), the First Circuit discounted such a defense.[7] Cook, an

---

7. Although Cook brought suit under the Rehabilitation Act, 29 U.S.C. § 794, the standards applicable to the Rehabilitation Act are the same

standards used in a case brought under the ADA. 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in

obese nurse, was refused employed by the State of Rhode Island Department of Mental Health, Retardation and Hospitals ("MHRH") on the basis of her obesity. According to MHRH, employment was denied because "Cook's morbid obesity compromised her ability to evacuate patients in case of an emergency and put her at greater risk of developing serious ailments." *Id.* at 21. The First Circuit did not discuss the safety aspect of MHRH's decision not to hire Cook, instead finding that MHRH's articulated reason for not hiring Cook was direct evidence that MHRH regarded Cook as disabled.

In the instant case, Dr. Frierson's opinion regarding Manuel's mobility constitutes the same type of direct evidence that Texas Bus Lines regarded Manuel as disabled. Given that evidence of discrimination along with the fact that the health and safety concerns now expressed by Texas Bus Lines are theoretical at best, the Court concludes that Texas Bus Lines has not met its burden of proof on its defense. As none of Texas Bus Lines' claimed defenses is applicable to the uncontested facts of this case, the Court finds that Texas Bus Lines impermissibly discriminated against Arazella Manuel on the basis of a perceived disability in violation of 42 U.S.C. § 12101 *et seq.*

## V. *TEXAS BUS LINES DID NOT VIO-LATE THE ADA BY MAKING PRE-OFFER MEDICAL INQUIRIES ON ITS APPLICATION FORM*

 While the issue of the alleged impermissible pre-offer medical inquiries contained in Texas Bus Lines' application for employment is not directly related to Manuel's claim of discrimination, the EEOC contends that it "is concerned about a per se violation of the ADA, which may have adversely affected numerous candidates." (Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Document No. 25 at 21).

In response, Texas Bus Lines maintains that the application form merely requests that the applicant "[l]ist any physical defects such as eyesight, hearing, limb impairment, diabetes, back or heart trouble, high blood pressure, fits, convulsions, fainting, etc.," all of which are expressly addressed by the DOT regulations and are, therefore, included for a legitimate and nondiscriminatory job-related and business purpose. (Bus Driver Application for Employment, Document No. 13, Exhibit 2; Document No. 21 at 6–7).

With regard to a pre-offer, pre-employment inquiry, the ADA provides that "[e]xcept as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." 42 U.S.C. § 12112(d)(2)(A). Paragraph 3, as mentioned above, states that a "covered entity may require a medical examination **after** an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition the offer of employment on the results of such examination ..." in particular circumstances. 42 U.S.C. § 12112(d)(3) (emphasis added). However, the ADA further provides that a "covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions." 42 U.S.C. § 12112(d)(2)(B).

Having reviewed the Bus Driver Application for Employment form utilized by Texas Bus Lines, the Court finds that the general "physical defect" inquiry does not violate the ADA. The basic medical inquiries made by Texas Bus Lines are reasonably related to the position of bus driver. Physical defects such as eyesight, hearing, limb impairment, diabetes, back or heart trouble, high blood pressure, fits, convulsions, fainting, etc., in light of the requirements of the bus driver position, are relevant job-related inquiries and are consistent with business necessity. Moreover, Texas Bus Lines specifically delineates those "physical defects" set forth in the DOT instructions to the examining health care professional. *See* 49 C.F.R. § 391.43(e). For the foregoing reasons, the Court finds that Texas Bus Lines' pre-offer, pre-employment medical inquiries do not constitute a per se violation of the ADA.

a complaint alleging employment discrimination under this section shall be the standards applied

under title I of the Americans with Disabilities Act of 1990").

## VI. CONCLUSION

If an employer's relationship with a physician who conducts a medical examination results in the discriminatory rejection of applicants protected by the ADA, the employer is liable for a violation of the statute despite the involvement of a third party, the doctor, with whom the employer had a professional arrangement. The Court finds that Defendant Texas Bus Lines did discriminate against Ms. Manuel based on its perceived disability of Manuel in violation of the ADA. The Court further finds that Defendant's pre-offer medical inquiries on its employment application form are consistent with the ADA, and the DOT regulations and, therefore, do not violate the ADA.

There are no genuine issues of material fact in controversy in this case. The EEOC is entitled to summary judgment as a matter of law with respect to the issue of disability discrimination and Texas Bus Lines is entitled to summary judgment as a matter of law on the issue of pre-offer application inquiries. Therefore, the Court

ORDERS that Plaintiff Equal Employment Opportunity Commission's Motion for Partial Summary Judgment on the Issue of Liability (Document No. 13) is GRANTED IN PART solely with respect to the issue of disability discrimination, and is DENIED IN PART with respect to the pre-offer inquiries on Defendant's employment application form.

It is further ORDERED that Defendant's Motion for Summary Judgment (Document No. 24) is GRANTED IN PART solely with respect to the issue of pre-offer inquiries on Defendant's application for employment form, and is DENIED IN PART with respect to the issue of disability discrimination.